**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

PERRY HILL and JAMES ROGERS, both individually
and on behalf of a class of others similarly situated,

                                    Plaintiffs,                    9:14-cv-00933 (BKS/DJS)

v.

COUNTY OF MONTGOMERY, MICHAEL AMATO,
and MICHAEL FRANKO,[1]

                                    Defendants.

**APPEARANCES:**

*For Plaintiffs:*
Law Offices of Elmer Robert Keach, III, P.C.
Elmer Robert Keach, III
Maria K. Dyson
One Pine West Plaza, Suite 109
Albany, NY 12205

Migliaccio & Rathod LLP
Nicholas A. Migliaccio
Jason S. Rathod
412 H Street N.E., Suite 302
Washington, DC 20002

*For Defendants:*
Goldberg Segalla LLP
Jonathan M. Bernstein
8 Southwoods Boulevard, Suite 300
Albany, NY 12211

---

[1] Defendants note that Defendant Michael Franko has retired. (Dkt. No. 88-18, at 29). To the extent he is sued in his official capacity, his "successor is automatically substituted as a party." Fed. R. Civ. P. 25(c). Claims against Defendant Franko in his individual capacity remain.

**Hon. Brenda K. Sannes, United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I.     INTRODUCTION

Plaintiffs Perry Hill and James Rogers bring this conditions-of-confinement case, and proposed class action, under 42 U.S.C. § 1983 against Defendants County of Montgomery, Michael Amato, and Michael Franko. (Dkt. No. 136). Plaintiffs allege that Defendants failed to provide adequate nutritional sustenance while they were at the Montgomery County Jail ("MCJ") in Fultonville, New York, in violation of the Eighth and Fourteenth Amendments. (*Id.*). Presently before the Court is Plaintiffs' motion for class certification under Rule 23 of the Federal Rules of Civil Procedure. (Dkt. No. 106). Acknowledging that the damages inquiry does not meet the predominance requirement because "the severity of the injuries will vary," Plaintiffs seek certification of a liability class only. (Dkt. No. 74, at 24–25; Dkt. No. 106). Plaintiffs ask the Court to certify as a primary class "[a]ll detainees who have been or will be placed into the custody of the [MCJ] and were detained for at least two consecutive weeks" from July 25, 2011 to the present; Plaintiffs also seek certification of a pretrial detainee subclass (Fourteenth Amendment) and a convicted prisoner subclass (Eighth Amendment). (Dkt. No. 106). Defendants oppose the motion. (Dkt. Nos. 88, 113). For the following reasons, Plaintiffs' motion for class certification is granted.

## II.     PROCEDURAL HISTORY

On July 25, 2014, Hill filed the Complaint in this action. (Dkt. No. 1). On February 27, 2017, after conducting significant discovery, Hill moved for class certification. (Dkt. No. 73). The Court denied the motion without prejudice to renewal upon further briefing: (1) as it was unclear from his papers whether Hill, who was held at MCJ in connection with a probation

violation, was a pretrial detainee or a convicted prisoner[2]; and (2) because Hill's claim for injunctive and declaratory relief was in all likelihood moot as he had been released from MCJ before filing this action, and thus did not have standing to seek such relief on behalf of the purported class. *Hill v. County of Montgomery*, No. 14-cv-933, 2017 WL 9249663, at \*4–5, \*9 (N.D.N.Y. Sept. 29, 2017).[3]

On November 21, 2017, Hill filed a supplemental motion for class certification, briefing on the issues the Court identified, and a motion for leave to amend the Complaint under Rule 15. (Dkt. Nos. 106, 107). At the same time, James Rogers, who had been an inmate at MCJ as both a pretrial detainee and a convicted prisoner, filed a motion for leave to intervene, under Rule 24, as a named plaintiff and class representative. (Dkt. No. 106). Defendants opposed these motions. (Dkt. No. 113).

On May 29, 2018, following oral argument and additional briefing, (Dkt. No. 125, 126, 127), the Court dismissed the claim for declaratory and injunctive relief, granted the motion to amend the complaint and Rogers' motion to intervene for purposes of: (1) adding Rogers as a Plaintiff with a Fourteenth Amendment and an Eighth Amendment conditions-of-confinement damages claim; (2) clarifying Hill's status as a pretrial detainee; and (3) clarifying that Plaintiffs seek certification under Fed. R. Civ. P. 23(b)(3) and 23(c)(4) for liability only. (Dkt. No. 128, at 17). The Court did not, at that time, address the renewed motion for class certification but directed further briefing on the predominance and superiority requirements of Rule 23(b)(3), which Plaintiffs had not specifically addressed in their motion papers. The parties subsequently

---

[2] Hill's status dictates whether his conditions-of-confinement claim falls under the Fourteenth Amendment's due process clause (pretrial detainee) or the Eighth Amendment's cruel and unusual punishment clause (convicted prisoner).

[3] Lexis citation unavailable.

briefed these requirements. (Dkt. Nos. 131, 134). On August 9, 2018, Plaintiffs filed an Amended Complaint. (Dkt. No. 136).

## III.     BACKGROUND

In support of their motion for class certification, Plaintiffs rely on the Amended Complaint, their depositions, the depositions of five other MCJ inmates, the depositions of Defendants Amato and Franko, as well as the depositions of a number of MCJ staff who work in the kitchen and medical department, MCJ meal plans, a sample of inmate surveys, and the opinion of Heidi Jay Silver, an expert in the area of nutrition. Defendants have submitted expert reports by Katherine Streeter, a registered dietitian, and William Graber, M.D.[4] The Court has carefully considered all the evidence and outlines the evidence relevant to the disposition of the renewed motion for class certification.

### A.     Montgomery County Jail

Approximately 1,000 individuals enter MCJ every year; it is a 177-bed facility. (Dkt. No. 75-5, at 45; Dkt. No. 75-2, at 36). Since 2010, Trinity Services Group ("Trinity") has been MCJ's food provider. (Dkt. No. 88-3, ¶ 2). A Trinity dietitian sets the menu at MCJ and specifies the serving sizes.[5] (Dkt. No. 75-3, at 10, 58). Inmates at MCJ are supposed to receive three meals per day and, on average, 2,900 calories per day. (Dkt. No. 75-2, at 8, 25). Trinity requires the jail to make a substitution if an item specified on the menu is unavailable—if milk has spoiled, for instance. (*Id*. at 56–57). The MCJ cook decides what to substitute for the unavailable menu item. (*Id*. at 144). In general, no one from Trinity reviews substitution decisions. (*Id*. at 93).

---

[4] Defendants also submitted a report by Martin Horn, an expert in the area of correctional facilities policies and procedures, but do not appear to rely on it.

[5] Amato testified that the MCJ kitchen staff and Trinity "put together" the diet. (Dkt. No. 75-2, at 56).

Lynn Dumar, who is employed as a cook at MCJ, explained that an item might be substituted if they were out of stock or it was winter and the food delivery truck did not arrive on time. (Dkt. No. 75-3, at 27). Dumar stated that, generally, a vegetable is replaced with another type of vegetable and a starch is replaced with another starch. (*Id*.). Dumar testified that a production sheet must be filled out for every meal and that if there is a substitution it is usually noted. (*Id*. at 92).

Dumar testified that she takes inventory of the storage, dry storage, cooler, and freezer, and then places a food order via computer on a weekly basis. (*Id*. at 41). Dumar testified that her weekly orders often include fruit,[6] canned fruit, frozen vegetables, potatoes, eggs, cottage cheese, and meats, (*id*. at 80–82), and that she orders dry goods such as pudding, Jell-O, Kool-Aid, and spices four times per year, (*id*. at 46). Dumar stated that a Trinity representative periodically visits MCJ to "check the line and make sure we are serving the right portions." (*Id*. at 58).

Dumar stated that she instructs the inmates who work in the kitchen to use specific utensils, explaining that if they are supposed to serve one cup of mashed potatoes, they use a one-cup utensil to scoop the potatoes and level it off before placing it on the tray. (*Id*. at 50). Kenneth Crouse, an inmate who worked in the kitchen,[7] testified that three or four times each week he was instructed to ladle out less than the prescribed amount of food because they were running low. (Dkt. No. 95-2, at 13).

---

[6] Dumar stated that inmates generally receive fresh fruit once a week. (*Id*. at 44). Kenneth Crouse, a former MCJ inmate, testified that fresh fruit was never served. (Dkt. No. 75-22 at 39).

[7] Inmates receive an extra meal as payment for working in the kitchen. (Dkt. No. 75-2, at 25).

### B.     Plaintiff Perry Hill

Hill was detained at MCJ from September 2013 to March 2014 for a parole violation. (Dkt. No. 75-6, at 16). Hill testified that he weighed approximately 160 pounds when he entered MCJ and 134 pounds when he left. (*Id*. at 72). Hill stated that his meals at MCJ typically consisted of: oatmeal, a breakfast cake, or cereal for breakfast; a sandwich and vegetable, and maybe fruit for lunch; and a chicken patty or beef stroganoff and a vegetable for dinner. (*Id*. at 36–37). Hill stated that he believed that the diet provided, including meat, was soy-based. (*Id*. at 79). He was "always" hungry. (*Id*. at 38). Hill testified that he complained "[a]ll the time" to corrections officers about there being "so little food" but that he never received a response. (*Id*. at 39). Hill testified that he ate cocoa butter sticks, vitamins that he purchased from the commissary, and toothpaste to supplement his diet. (*Id*. at 54).

Hill testified that he had no medical conditions prior to entering MCJ. (*Id*. at 26). Hill testified that he was depressed about "being in" MCJ and "going through starvation." (*Id*. at 80). Hill lost hair and experienced receding and bleeding gums, dizziness and nausea at MCJ. (*Id*. at 55–58). Hill witnessed "multiple fights" over food. (*Id*. at 48, 58–59). Hill testified that he "worked out his whole life" but stopped working out while at MCJ because "you can't build muscle if you're not eating." (*Id*. at 62). Hill testified that he had difficulty sleeping because he was "hungry" and the "sleeping conditions" were "poor." (*Id*. at 82).

### C.     Plaintiff James Rogers

Rogers was detained at MCJ from June 2014 to February 2015. (Dkt. No. 113-2, at 35). He was arrested in June 2014, pled guilty in November 2014, and remained at MCJ until February 2015. (*Id*. at 32–33). Upon admission to MCJ, Rogers weighed approximately 195 pounds. (Dkt. No. 136, ¶ 34). "Rogers lost approximately 15 pounds during his eight-month admission to the jail," and asserts that this "weight loss was . . . substantial given he is 6'1, and is

an extremely thin man." (*Id*.). Rogers testified that he and others filed grievances "that the food wasn't healthy enough." (Dkt. No. 113-2, at 44). Rogers testified that he was hungry "most of the day" while at MCJ even though he received three meals per day. (Dkt. No. 113-2, at 57). Rogers suffered hair loss while at the jail. (Dkt. No. 113-2, at 65).

### D.     Other Detainees

In support of their motion, Plaintiffs submitted the deposition testimony of several other individuals who had been at MCJ for more than two weeks during the proposed class period. (Dkt. Nos. 75-4 (Eric Engle); 75-10 (Robert Pettit); 75-9 (Bruce O'Shaughnessy); 75-22 (Kenneth Crouse); and 95-1 (Robert Washington)). Eric Engle testified that the portions were "incredibly small and he was . . . extremely hungry." (Dkt. No. 75-4, at 14). Engle stated that he complained but that "the only answers I was getting from the kitchen staff, most of the guards didn't know that is what was decided by the jail administrator, it was enough calorie intake and you are not going to get any more." (Dkt. No. 75-4, at 69).

Robert Pettit testified that when he was in MCJ in 2012 and 2013,[8] the meals did not fill him up, he was hungry all day every day, he felt weak, and he lost hair due to "[l]ack of food." (Dkt. No. 75-10, at 46, 63).

Kenneth Crouse testified that he has been held at MCJ approximately 20 times. (Dkt. No. 75-22, at 51). He stated that he often worked in the MCJ kitchen, where he helped prepare meals. (*Id*. at 10). Crouse explained that he used a "scooping tool" to place food on trays, and that they were ladles that were either one-half cup or one cup in size. (*Id*. at 11). Crouse stated that the ladles were supposed to be filled but that three to four times per week "we were told to give less amounts because it was running low." (*Id*. at 12). Crouse explained that when the food "started

---

[8] Pettit appears to have been a pretrial detainee during some of the time he was at MCJ in 2012 and 2013. (Dkt. No. 75-10, at 8–9).

getting low" he was instructed to "skimp it down" and give a half-cup ladle instead of a full-cup ladle. (*Id*. at 15). Crouse stated that when he was in the general population at MCJ, the food portions he received were small and he lost weight. (*Id*. at 17). Crouse stated that MCJ began making sandwiches available for purchase on certain nights. (*Id*. at 21–22). Crouse lost hair while at MCJ. (*Id*. at 23).

### E.   Defendant Michael Amato

Defendant Michael Amato, the Sheriff of Montgomery County, testified that he was aware that inmates were complaining that "they wanted more food," and that "they were hungry." (Dkt. No. 75-2, at 9, 14). Corrections officers also told him that inmates were complaining that they wanted more food. (Dkt. No. 75-2, at 16). He stated that as of 2013 he was aware that inmates had complained about the portion sizes of the food at MCJ. (Dkt. No. 75-2, at 77). Amato believed, however, that the inmates were complaining about portion sizes because they wanted the commissary back, which had been removed. (*Id*. at 83).

### F.   Defendant Michael Franko

Michael Franko, the MCJ Jail Administrator, testified that he was aware that there were "a number of grievances about food" and that inmates were complaining that they did not like the food and that they were not getting enough. (Dkt. No. 75-5, at 8, 12). Franko stated that MCJ prepares "meals within a caloric range," on average, 2,900 calories, but that "how much [inmates] actually eat is up to them." (Dkt. No. 75-5, at 24–25). Franko explained that the menus are set through Trinity, and "the caloric intake is reviewed and approved by their dietician" and MCJ's "recipes reflect that." (*Id*. at 27).

### G.      Plaintiff's Expert – Heidi Jay Silver

Heidi Jay Silver is a Research Associate Professor of Medicine in the Division of Gastroenterology, Hepatology, and Nutrition in the School of Medicine, Department of Medicine, at Vanderbilt University Medical Center, Nashville, Tennessee. (Dkt. No. 75-1, at 1). Silver analyzed a number of documents, including spreadsheets of Trinity's menus and nutrient analysis of menus, Dumar's deposition, the Commission of Corrections' investigatory materials about food substitutions, meal records from January to February 2013 and January to February 2014, and photographs of Plaintiff and a second MCJ inmate. (Dkt. No. 75-1, at 2).

Silver opined that the inmates of MCJ "experienced clinically significant weight loss during the period of time in which they were incarcerated" because the calories they consumed at MCJ were "less than the energy requirements for maintaining their initial admission body weight." (*Id*. at 3). After reviewing Trinity's menus, Silver stated that she agrees "that the daily menus as planned are designed to provide" "a range of 2350-3065 calories per day." (*Id*.). After reviewing MCJ incident reports as well as the weight loss of fifteen inmates, Silver stated that in her opinion, however, it was "apparent that there are frequent occasions when substitutions are being made for food items that provide fewer calories and other nutrients than what was planned in the written cycle menus." (*Id*. at 4–5). These substitutions, she believes, created caloric and protein deficits as well as deficits in, among others, fiber, iron, calcium, potassium, Vitamin A, and Vitamin D. (*Id*. at 6). Silver created a table ("Table A") listing "the initial admission and discharge weights for several inmates" as well as "the amount of calories needed per day to maintain the initial admission weight, the amount of weight loss for each individual (based on the available evidence), the rate of weight loss per week, and the energy deficit (amount of calories not being consumed each day) that would provide this amount of weight loss." (*Id*. at 3). Table A:

| | Inmate | Height | Initial Weight at Admission | Calorie Need Per Day to Maintain Admission Weight | Weight at Discharge | Period of Time | Number of Weeks | Amount of Weight Loss | Rate of Weight Loss per Week | Energy Deficit per Day that Would Provide This Amount of Weight Loss (kcal/day) |
|---|---|---|---|---|---|---|---|---|---|---|
| | CA | 61" | 120 | 1636 | 114 | 3/9/14 - 4/15/14 | 5 | 6 lb | 1.2 lb | 600-800 |
| | CB | 74" | 220 | 3000 | 195 | 11/2013 - 4/2014 | 21.5 | 25 lb | 1.2 lb | 600-800 |
| | DC | 68" | 160 | 2182 | 150 | 5/13/12 - 8/31/12 | 16 | 10 lb | 0.6 lb | 275-450 |
| | KE | 73" | 170 | 2318 | 155 | 3/4/13 - 6/28/13 | 66 | 15 lb | 0.2 lb | 110-150 |
| | JH | 63" | 138 | 1882 | 110 | 5/17/13 - 6/25/13 | 6.5 | 28 lb | 4.3 lb | 2000-2500 |
| | GH | 66" | 190 | 2591 | 170 | 12/10/12- 4/9/13 | 16.5 | 20 lb | 1.2 lb | 600-800 |
| | RG | 75" | 260 | 3545 | 245 | 12/7/15-1/19/16 | 6 | 15 lb | 2.5 lb | 1250-1500 |
| | PM | 73" | 165 | 2250 | 147 | 3/2015 - 7/2015 | 19 | 18 lb | 0.9 lb | 475-700 |
| | AP | 72" | 215 | 2932 | 200 | 4/2012 - 3/2013 | 49 | 15 lb | 0.3 lb | 195-200 |
| | SF | 68" | 165 | 2250 | 140 | 1/29/13 - 7/2013 | 23.5 | 25 lb | 1.1 lb | 525-745 |
| | JR | 73" | 195 | 2659 | 180 | 6/12/14 - 2/9/15 | 36 | 15 lb | 0.4 lb | 225-350 |
| | TR | 71" | 196 | 2673 | 170 | 10/2014 - 2/2015 | 19 | 26 lb | 1.4 lb | 725-1000 |
| Gray Doc | CG | | 195 | | | | | | | |
| Gray Medical 3/26/14 | CG | | 212.5 | | | 3 months | 12 | 16.5 | 1.4 lb | 725-1000 |
| Grievance #19-005 | RP | 72" | 350 | | | 4 months | 16 | 45 lb | 2.8 lb | 1450-1800 |
| Grievance #11-118 | MV | | | | | 8.5 months | 34 | 21 lb | 0.6 lb | 275-450 |

 (*Id.* at 4). Silver further stated that after reviewing the MCJ incident reports, the weight loss of the inmates in Table A, and the "per meal records from 2013 & 2014," it is her opinion that "substitutions are being done on a regular basis" and "routinely result[] in a deficit of calories, protein and micronutrients (vitamins and minerals). (*Id.* at 5). Silver provided a second table ("Table B") to show the caloric and protein deficits created by substitutions for scheduled menu items. (*Id.* at 6). Table B:

| Cycle Menu Item | Substitution Item on Daily Meal Record | Energy Deficit Created | Protein Deficit Created | Other Nutrients Deficit Created |
|---|---|---|---|---|
| 1 cup Beans | 1 cup Corn | 80-100 calories | 9 - 11 grams | Fiber, Iron, Calcium, Potassium |
| 1 cup Pinto Beans | 1 cup Rice | | 10 grams | Fiber, Calcium, Potassium |
| 1 cup Milk | 1 cup Water | 122 calories | 8 grams | calcium, magnesium, phosphorus, flouride, vitamin A, vitamin D, folate, choline |
| 1 Blueberry Muffin | 1 Slice Bread | 110 calories | 1.3 grams | potassium, fiber |
| 1 Sugar Cookie | 4 oz Applesauce | 120-140 calories | 1.8 grams | |
| 1 Cake | 4 oz Applesauce | 250 calories | 2-4 grams | |
| 1 Apple Coffee Cake | 4 oz Applesauce | 80-100 calories | 1.8 grams | |
| 1 Cake | Canned Peaches | 250 calories | 2-5 grams | |
| Gravy | Ketchup | | | Fat, potassium, calcium |
| Margarine | Ketchup | | | Fat, potassium, calcium |
| Cheese & onions | Ketchup | | | Fat, potassium, calcium |

(*Id.*).

Silver viewed facial photographs of Hill and a second inmate, "for whom the reduction in body mass (loss of fat and muscle mass) is physically apparent" and opined that the weight loss is "clinically significant." (*Id*. at 7). Silver defined "clinically significant" as the loss of ten percent or more body weight in a six month period or five percent of body weight in a period of three months." (*Id*. at 3).

Regarding the effects of an inadequate diet, Silver indicated that hair loss may be caused a deficit in protein, Vitamin E, zinc, selenium, and biotin; bleeding gums may be caused by a Vitamin C deficiency; skin changes may be caused by a deficiency in Vitamin E, Vitamin A, and fatty acids. (*Id*. at 7). Additionally, Silver stated that "[w]ith hunger, there is an increased focus on finding other items to substitute for the inadequate food intake – the effect of hunger is consistent with the aberrant eating behaviors reported by counsel of inmates consuming toothpaste, cocoa butter and toilet paper to assuage their hunger." (*Id*. at 8).

## H.    Defendants' Expert – Katherine Streeter

Defendants submitted an expert report by Katherine Streeter, a clinical dietician and assistant director of nutrition services in long-term, transitional, and adult day care facilities. (Dkt. No. 88-1, at 6). In formulating her opinion, Streeter reviewed discovery materials, the Complaint, "Jail Policy," MCJ meal records from 2011 to 2014, inmate grievance records, and deposition testimony. (*Id*. at 23–24). "To verify nutritional composition of menus," Streeter "selected a 10% representation of meals in the 28-day cycle (a sample of three nonconsecutive days) to analyze." (*Id*. at 13). To "ascertain what was actually prepared by the kitchen," Streeter reviewed the meal records from October 2013 to March 2014. (*Id*.). Streeter noted that there were "notations on many days indicating when a substitution for part of the house or for the whole house needed to be made." (*Id*.). In Streeter's opinion, "[t]ypically, nutritionally-equivalent substitutions were made during that time," including "oatmeal served instead of

farina; rice served instead of potatoes, brownies instead of white cake." (*Id.*). Streeter provided

the following table containing her analysis[9] of three days of the Trinity menu:

| | RDA Range | Reference value | Trinity Analysis | Vs. RDA | Writer's analysis | Vs. RDA |
|---|---|---|---|---|---|---|
| Calories | 2200-2900 | 2900 | 2940.0 | Meets | 2880.7 | Meets |
| Carbohydrate (gm) | 326-471 | 398.5 | 409.4 | Meets | 381.0 | Meets |
| Protein (gm) | 59-63 | 61 | 106.4 | Exceeds (+74.4%) | 99.2 | Exceeds (+54.8%) |
| Fat (gm) | 65-113 | 89 | 95.0 | Meets | 108.7 | Meets |

(*Id.* at 14).

In a subsequent report, Streeter responded to Silver's opinion that the substitutions were

creating nutritional deficits as follows:

> Silver's calculations fail to account for instances when a substitution was made that provide *more* calories than the original item. During a brief look at menus from the time period she evaluated, I found at least a half-dozen such examples (below is not an exhaustive list, merely examples):
>
> o 1/2/13 lunch – mayo (118 kcal) instead of gravy (52 kcal)
> o 1/2/13 dinner – bologna (267 kcal) instead of turkey ham (142 kcal)
> o 1/4/13 dinner – cake (288 kcal) instead of sugar cookies (212 kcal)
> o 1/22/13 lunch – mayo (118 kcal) instead of BBQ sauce (58 kcal)

---

[9] In her report, Streeter explained the table as follows:

> RDA range refers to the accepted range as detailed in the Generalized Nutrition Needs section above. Reference value is the numerical midpoint or target value within the RDA range, against which further calculations are compared. Trinity analysis is the numerical average of the three nonconsecutive sample days, as analyzed by the Trinity Health dietitian. Writer's analysis is my evaluation of the nutritional composition of the same three days, as described above. In the Vs. RDA columns, I have noted whether the menu as analyzed fails to meet, meets, or exceeds the requirement.

(Dkt. No. 88-1, at 14).

- 1/23/13 dinner – 8oz chili with 4oz macaroni instead of 4 oz chili with 8oz macaroni (38 calories more, increased protein, decreased carbohydrate)
- 1/30/13 lunch – peas (90 kcal) instead of steamed cabbage (48 kcal)
- 2/11/13 dinner – rice (298 kcal) instead of sugar cookies (212 kcal)
- 2/28/13 lunch – coleslaw (199 kcal) instead of tossed salad with dressing (17+100 kcal)

(*Id.* at 90 (internal citations omitted)).

## I.   Defendants' Expert William Graber, M.D.

Defendants also submitted an expert report by William Graber, M.D., who examined records concerning Hill, and six other inmates. (Dkt. No. 88-1, at 79–81). Dr. Graber opined that if these individuals "did have any weight loss [or malnourishment] it could be attributed to" a history of drug use or medical illness. (*Id.*).

## IV.   MOTION FOR CLASS CERTIFICATION

### A.   Standard

For a matter to proceed as a class action, a plaintiff must first satisfy four requirements: (1) numerosity ("the class is so numerous that joinder of all members is impracticable"); (2) commonality ("there are questions of law or fact common to the class"); (3) typicality ("the claims or defenses of the representative parties are typical of the claims or defenses of the class"); and (4) adequacy of representation ("the representative parties will fairly and adequately protect the interests of the class"). Fed. R. Civ. P. 23(a). In addition, the Second Circuit has "'recognized an implied requirement of ascertainability in Rule 23,' which demands that a class be 'sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member.'" *Univs. Superannuation Scheme Ltd. v. Petróleo Brasileiro S.A.* (*In re Petrobras Sec.*), 862 F.3d 250, 260 (2d Cir. 2017) (quoting *Brecher v. Republic of Argentina*, 806 F.3d 22, 24 (2d Cir. 2015)).

Assuming the requirements of Rule 23(a) are met, a class action may only be maintained if the plaintiff also qualifies the proposed class under one of the categories in Rule 23(b). Fed. R. Civ. P. 23(b). Here, Plaintiffs seek to certify the class for purposes of compensatory relief under Rule 23(b)(3), though limited to the issue of liability under Rule 23(c)(4), as damages will require an individualized inquiry. (*See generally* Dkt. No. 131). The court may certify a Rule 23(b)(3) class if it "finds that questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

The party seeking class certification bears the burden of satisfying Rule 23's requirements by a preponderance of the evidence. *Goldemberg v. Johnson & Johnson Consumer Cos., Inc.*, 317 F.R.D. 374, 384 (S.D.N.Y. 2016). Thus, "a court must 'probe behind the pleadings before coming to rest on the certification question,' satisfying itself that Rule 23 compliance may be demonstrated through 'evidentiary proof.'" *Johnson v. Nextel Commun. Inc.*, 780 F.3d 128, 138 (2d Cir. 2015) (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013)). "[T]his inquiry may sometimes overlap with merits issues, though the determination as to a Rule 23 requirement is not binding on the trier of fact in its determination of the merits." *Id.* "Furthermore, in order to certify a class, the proponent of class certification need not show that the common questions 'will be answered, on the merits, in favor of the class.'" *Id.* (quoting *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013)). While the requirements "are to be applied liberally," the court must still "conduct a rigorous analysis of the criteria set forth in Rule 23." *Friedman-Katz v. Lindt & Sprungli (USA), Inc.*, 270 F.R.D. 150, 153–54 (S.D.N.Y. 2010). "A district judge is to assess all of the relevant evidence admitted at the class

certification stage and determine whether each Rule 23 requirement has been met, just as the judge would resolve a dispute about any other threshold prerequisite for continuing a lawsuit." *Miles v. Merrill Lynch & Co.* (*In re Initial Pub. Offerings Sec. Litig.*), 471 F.3d 24, 42 (2d Cir. 2006).

**B.     Proposed Classes**

Plaintiffs seek to certify a Primary Class and two Sub-Classes:

> Primary Class
>
> All detainees who have been or will be placed into the custody of the Montgomery County Jail and were detained for at least two consecutive weeks. The class period commences on July 24, 2011, and extends to the date on which Montgomery County is enjoined from, or otherwise ceases, enforcing its policy, practice and custom of refusing to provide an appropriate amount of nutritional sustenance to all detainees admitted to the Montgomery County Jail. Specifically excluded from the class are Defendant and any and all of its respective affiliates, legal representatives, heirs, successors, employees or assignees.
>
> > Pre-Trial Detainee Sub-Class
> >
> > All members of the Primary Class but who were housed as a PreTrial Detainee, in that they had not yet been convicted of their charges.
> >
> > Post-Trial Detainee Sub-Class
> >
> > All members of the Primary Class, but who were housed as a PostTrial Detainee, in that they had been convicted of their charges, either by a plea or jury trial.

(Dkt. No. 106).[10]

---

[10] "When appropriate, a class may be divided into subclasses that are each treated as a class under" Rule 23. Fed. R. Civ. P. 23(c)(5).

**C.      Section 1983 – Conditions of Confinement**

The Constitution requires "that prisoners be served 'nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it' [and] under certain circumstances a substantial deprivation of food may well be recognized as being of constitutional dimension." *Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir. 1983). Under both the Eighth and Fourteenth Amendments, a plaintiff must establish an objective element and a subjective element for a § 1983 conditions-of-confinement claim. Under both amendments, "to establish an objective deprivation, 'the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health.'" *Darnell v. Pineiro*, 849 F.3d 17, 30 (2d Cir. 2017) (quoting *Walker v. Schult*, 717 F.3d 119, 126 (2d Cir. 2013)). "[C]onditions of confinement may be aggregated to rise to the level of a constitutional violation, but 'only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise.'" *Walker*, 717 F.3d at 125 (quoting *Wilson v. Seiter*, 501 U.S. 294, 304 (1991)).

The subjective element requirement, however, differs between the two amendments. Under the Eighth Amendment, a defendant "cannot be found liable . . . for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference." *Darnell*, 849 F.3d at 32 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). The mens rea requirement for pretrial detainees under the Fourteenth Amendment, on the other hand, is defined objectively. *Id.* at 35. A pretrial detainee must prove "that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to

16

mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 29, 35.

## V.     ANALYSIS

### A.     Rule 23(a) Requirements

#### 1.     Numerosity

Rule 23(a)(1) first requires that the proposed class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). The proposed class in this case includes "[a]ll detainees who have been or will be placed into the custody of the Montgomery County Jail and were detained for at least two consecutive weeks." (Dkt. No. 136, ¶ 9). In general, "numerosity is presumed at a level of 40 members." *Consol. Rail Corp. v. Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995). Here, Plaintiffs claims that (1) "thousands of [individuals] were held within the MCJ during the class period;" and (2) more than a hundred individuals have contacted counsel indicating that they wish to be part of this lawsuit. (Dkt. No. 74, at 16). Additionally, Plaintiff has submitted the deposition testimony of several MCJ inmates who claim weight loss or malnutrition and hunger, more than twenty surveys of MCJ inmates claiming that they suffered malnutrition, hunger, or weight loss. Plaintiff's expert's report contains a table of fourteen detainees, all of whom were at MCJ for longer than two weeks and lost weight. (Dkt. No. 75-1, at 4). Defendants contend that Plaintiff has failed to show numerosity because there is no evidence that "these thousands or even hundreds of people lost weight to an unhealthy point while at the jail." (Dkt. No. 88-18, at 13).

"[I]n assessing numerosity a court may make 'common sense assumptions' without the need for 'precise quantification of the class.'" *Russo v. CVS Pharmacy, Inc.*, 201 F.R.D. 291, 295 (D. Conn. 2001) (quoting *Pecere v. Empire Blue Cross & Blue Shield*, 194 F.R.D. 66, 69

(E.D.N.Y. 2000)); *see also* 1 Herbert B. Newberg, Newberg on Class Actions: A Manual for Group Litigation at Federal and State Levels § 3.05, at 139 (2d ed. 1985). Further, the numerosity inquiry is not "strictly mathematical." *Pa. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co.*, 772 F.3d 111, 120 (2d Cir. 2014). Rather, it

> must take into account the context of the particular case, in particular whether a class is superior to joinder based on other relevant factors including: (i) judicial economy, (ii) geographic dispersion, (iii) the financial resources of class members, (iv) their ability to sue separately, and (v) requests for injunctive relief that would involve future class members.

*Id.*

In this case, in view of the evidence that MCJ can house 177 individuals at any given time, and that the substitution and reduction policy has endured for a number of years, the Court finds it is reasonable to conclude that there are a sufficient number of present and former MCJ detainees to satisfy the numerosity requirement. Further, as there may be well in excess of forty class members who are unlikely to have the financial resources to sue separately, judicial economy favors certification over joinder.

## 2.    Commonality

Next, a plaintiff seeking class certification must show "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "A question of law or fact is common to the class if the question is capable of classwide resolution—which means that its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Johnson,* 780 F.3d at 137 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)) (citations and internal marks omitted). The common question(s) must generate "common answers apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc.*, 564 U.S. at 350 (internal quotation marks and emphasis omitted). "Where the same conduct or practice by the same defendant gives rise to the

same kind of claims from all class members, there is a common question." *Johnson*, 780 F.3d at 137 (quoting *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014)).

Plaintiffs assert that common questions in this case include: (1) "do County employees make changes to the menus that were approved by a qualified dietician, such that those changes provide detainees with inadequate nutrition"; (2) "[a]re these menu changes made pursuant to a policy or practice implemented by Montgomery County"; and (3) "[h]ave detainees suffered injuries as a result of this practice." (Dkt. No. 74, at 18). Defendants argue that "there are too many variables and factual scenarios to support commonality" and that Plaintiffs cannot show "that the alleged malnutrition occurred on a class wide basis when there are inmates that gained weight or had their weight remain the same." (Dkt. No. 88-18, at 16). Defendants further argue that Plaintiffs "fail[] to account for those inmates that worked in the kitchen that obtained double portions," (*id*. at 17), and have presented evidence that MCJ's medical unit has the ability to order more food for a pregnant inmate, and that changes are made to meals to accommodate diabetics. (Dkt. No. 75-2, at 81).

Plaintiffs allege that Defendants intentionally or recklessly employed a policy or practice of making changes to the menu designed by a Trinity dietitian to provide adequate calories and nutrition to inmates by substituting foods of insufficient caloric and nutritional value on a continual basis and at least twice weekly reducing portion sizes. The Second Circuit "has been reluctant to impose bright-line durational or severity limits in conditions of confinement cases, and has never imposed a requirement that pretrial detainees show that they actually suffered from serious injuries." *Darnell*, 849 F.3d at 31 (citing *Walker*, 717 F.3d at 129 (Eighth Amendment)). The Court finds that the answers to the above questions go to the heart of this case—whether Defendants, through a policy or practice of allowing calorically and nutritionally inadequate food

to be served to inmates on a continuous basis, subjected Plaintiffs, and other inmates, to conditions that posed "an unreasonable risk or serious damage to [their] future health." *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012). Accordingly, commonality is satisfied. *Butler v. Suffolk County*, 289 F.R.D. 80, 98 (E.D.N.Y. 2013) ("Whether the County was aware of and deliberately indifferent to the conditions at the [jail] is a common question subject to class-wide resolution."); *McGee v. Pallito*, No. 04-cv-335, 2015 WL 5177770, at *4, 2015 U.S. Dist. LEXIS, at *15 (D. Vt. Sept. 4, 2015) (finding "common issue" of whether prison officials' policy amounted to deliberate indifference and observing that "common questions" pertinent to the individual class members "frame the ultimate question of whether the Defendants' policy violates the Constitution"); *V.W. ex rel. Williams v. Conway*, 236 F. Supp. 3d 554, 575 (N.D.N.Y. 2017) (concluding that common questions included whether the defendants "applied a common course of unlawful conduct to the members of the class and subclass . . . acted with deliberate indifference to the substantial risk of serious harm posed by certain aspects of that common course of conduct," and whether the defendants "have collectively deprived plaintiffs of the education, special services, and related procedural protections to which they are entitled" and that the "common answers to these questions will drive the resolution of the litigation").

### 3. Typicality

Typicality "requires that the claims of the class representatives be typical of those of the class." *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 245 (2d Cir. 2007) (quoting *Robinson v. Metro-N. Commuter R.R. Co.*, 267 F.3d 147, 155 (2d Cir. 2001)). This requirement "is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997) (quoting *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 291 (2d Cir. 1992)). "[T]he

test for typicality is not demanding." *Pyke v. Cuomo*, 209 F.R.D. 33, 42 (N.D.N.Y. 2002) (internal quotations marks and emphasis omitted).

Defendants argue that Hill cannot satisfy the typicality requirement because his weight loss and the weight loss of other inmates could have been caused by "varying factors such as inmates' varying medical and substance abuse history and use of medications that effect weight." (Dkt. No. 88-18, at 19). Defendants' argument, however, overlooks Plaintiffs' contention that Defendants' ongoing policy or practice of serving nutritionally and calorically inadequate meals to inmates at MCJ caused them to suffer not only weight loss but also chronic hunger and malnutrition. "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Robidoux v. Celani*, 987 F.2d 931, 936–37 (2d Cir. 1993). Here, Hill, and the other MCJ inmates who were pretrial detainees, are alleged to have suffered as a result of MCJ's allegedly unlawful practice of regularly serving nutritionally and calorically inadequate meals. Thus, Hill has satisfied the element of typicality.

Defendants argue that Rogers' claim is not typical "because he is trying to wear two hats," "claiming a Fourteenth Amendment claim for his pre-trial time" from June 2014 to November 2014, and an "Eighth Amendment claim for his post-trial time" from November 2014 to February 2015. (Dkt. No. 113-16, at 19–20). Defendants also argue that Plaintiffs' failure to indicate when, during his time at MCJ, Rogers lost weight (fifteen pounds) additionally complicates his status. (*Id.* at 20).

"When the same unlawful conduct was directed at or affected both the named plaintiffs and the prospective class, typicality is usually met." *Stinson v. City of New York*, 282 F.R.D. 360,

371 (S.D.N.Y. 2012). Thus, while the legal standard applicable to Rogers changes depending on the time period under consideration, because Plaintiffs allege that Defendants' course of conduct of subjecting inmates to a nutritionally and calorically inadequate diet was the same throughout the duration of his incarceration at MCJ, his change in status does not render him atypical for class representation purposes. *See V.W.*, 236 F. Supp. 3d at 576 (finding that the plaintiffs carried their burden on typicality, explaining that "the members of the class and subclass share the same legal arguments because their claims are based on the common application of certain challenged policies"). Although "the extent of class members' exposure to the [alleged] conditions and the exact nature of their injuries will necessarily differ from those of the proposed class members, '[t]he representative claims need not be identical to the claims of every class member in order to meet the typicality requirement.'" *Butler*, 289 F.R.D. at 99 (quoting *Marriott v. County of Montgomery*, 227 F.R.D. 159, 172 (N.D.N.Y. 2005)) (certifying class of pretrial detainees and convicted prisoners in conditions-of-confinement action under Fourteenth and Eighth Amendments); *see Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561, 565 (S.D.N.Y. 2014) (finding typicality where "the lead plaintiffs' and other class members' claims arise out of the same course of conduct by the defendant and are based on the same legal theories"). Thus, the Court concludes that Rogers, who was, like the other inmates at MCJ, exposed to the allegedly unconstitutional diet, satisfies the typicality requirement.

### 4. Adequacy of Representation

Plaintiffs must also demonstrate that they "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "Generally, adequacy of representation entails inquiry as to whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000). In other words, the

plaintiff must be "prepared to prosecute fully the action and have no known conflicts with any class member." *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 253 (2d Cir. 2011).

Defendants argue that Hill "cannot adequately represent the class since he fails to proffer any medical proof that his alleged weight loss was due to the diet at the jail causing malnutrition." (Dkt. No. 88-18, at 21). This argument is, however, unavailing because it goes to the merits of Hill's case and does not, in any event, suggest that Plaintiff's "interests are antagonistic to the interests of other members of the class." *Baffa*, 222 F.3d at 60; *see also Rodriguez v. It's Just Lunch, Int'l*, 300 F.R.D. 125, 146 (S.D.N.Y. 2014) ("Because the ultimate merits of Berkowitz's claim are not relevant to determining whether Berkowitz is an adequate class representative, the Court does not—and indeed is prohibited from—evaluating the merits now.").

Defendants assert that Rogers cannot adequately represent the class because he testified that on the Fourth of July, he received a "special meal" for lunch and dinner, including "something extra, like ice cream," that on July 23, 2014, he stated to a MCJ staff member that he was "sleeping and eating well," and that on Thanksgiving and New Year's Day, he received special meals. (Dkt. No. 113-16, at 24–25). Defendants further assert there is evidence that Rogers missed meals and traded away food, and that this conduct created a calorie deficit that led to weight loss. (*Id.*). The allegations regarding Rogers' food intake may impact any damages inquiry as to Rogers but do not show he is an inadequate class representative. *See In re Frontier Ins. Grp., Inc. Sec. Litig.*, 172 F.R.D. 31, 47 (E.D.N.Y. 1997) ("Courts that have denied class certification based on the inadequate qualifications of plaintiffs have done so only in flagrant cases, where the putative class representatives display an alarming unfamiliarity with the suit,

display an unwillingness to learn about the facts underlying their claims, or are so lacking in credibility that they are likely to harm their case." (internal quotation marks and citations omitted)).

Plaintiffs' contention is that they and all other individuals housed at MCJ for two weeks or more have been subject to an unconstitutional deprivation of food and nutrition as a result of Defendants' alleged policy and practice of reducing portions and making calorically and nutritionally inadequate substitutions to the menu designed by the Trinity dietitian. Plaintiffs' interests are therefore identical to those other inmates housed at MCJ during the relevant time period. *See Stinson*, 282 F.R.D. at 371 (finding adequacy of representation because the "Plaintiffs' interests are identical to those of the putative class, as all plaintiffs have been allegedly injured by the same unconstitutional actions on the part of Defendants"). Moreover, there is no indication that Plaintiffs' interests are antagonistic to other potential class members. Thus, the Court concludes that Hill and Rogers are adequate class representatives.

As to their attorneys, Plaintiffs assert that the law firms representing them "possess extensive experience in litigating class actions, including those involving civil rights violations." (Dkt. No. 74, at 20). Defendants do not dispute that Plaintiffs' counsel are capable of protecting the interests of the class. Therefore, Plaintiffs have satisfied the adequacy requirement.

### 5. Ascertainability

The Second Circuit recently clarified that "[t]he ascertainability doctrine that governs in this Circuit requires only that a class be defined using objective criteria that establish a membership with definite boundaries." *Petrobras*, 862 F.3d at 264. "This modest threshold requirement will only preclude certification if a proposed class definition is indeterminate in some fundamental way." *Id.* at 269. The Circuit expressly "decline[d] to adopt a heightened

ascertainability theory that requires a showing of administrative feasibility at the class certification stage." *Id.* at 265.

Plaintiffs assert that the proposed class is "readily identifiable" and those pretrial detainees and convicted prisoners who remained in MCJ for more than two weeks can be identified through "booking records maintained at the MCJ." (Dkt. No. 74, at 21–22). Defendants argue that "it is impossible to tell who should be in the class without assessing each individual" and that heroin users who gained weight while in MCJ, individuals who worked in the kitchen and received double portions, and individuals who gambled away their meals should not be in the class. (Dkt. No. 88-18, at 22). Defendants attached more than a thousand pages of MCJ inmate medical records, which they claim the Court would have to review before determining whether a pretrial detainee "can legitimately claim unhealthy weight loss due to the diet at the jail." (*Id.* at 23). However, "[a]scertainability does not directly concern itself with the plaintiffs' ability to offer *proof of membership* under a given class definition, an issue that is already accounted for in Rule 23." *Petrobras*, 862 F.3d at 269. The question is not how difficult or practical ascertaining class members will be, but rather whether doing so is "objectively *possible*." *Id.* at 270. The Court concludes that the class definition contains only objective criteria: incarceration at the MCJ for two weeks or more during the relevant time period. Membership in the sub-classes is also governed by objective criteria: whether the individuals had been convicted of the charges against them at any point during their time at MCJ. *See Charron v. Pinnacle Grp. N.Y. LLC*, 269 F.R.D. 221, 229 (S.D.N.Y. 2010) (finding wrongful eviction class to be ascertainable and "defined by objective criteria," where the class membership was dependent on "whether a given apartment [was] rent-regulated" and "owned by the [defendant corporation]; and whether the putative class member [was] a tenant on a fixed date").

### 6.    Summary

The Court finds that Plaintiffs have met all of the preliminary requirements for certification under Rule 23(a). Thus, the next question is whether Plaintiffs have satisfied the requirements to certify a class under Rule 23(b).

### B.    Rules 23(b)(3) and (c)(4)

For certification under Rule 23(b)(3), Plaintiffs must establish that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Plaintiffs, acknowledging "that certification of a damages class will be difficult, given the lack of predominance of the proposed class members' injuries," seek certification under Rule 23(c)(4) only to determine "whether detainees were being denied adequate nutrition by virtue of the unapproved menu changes implemented by Montgomery County employees." (Dkt. No. 74, at 24). Rule 23(c)(4) provides: "When appropriate, an action may be brought or maintained as a class action with respect to particular issues." Fed. R. Civ. P. 23(c)(4). "Common issues—such as liability—may be certified, consistent with Rule 23, even where other issues—such as damages—do not lend themselves to classwide proof." *Johnson*, 780 F.3d at 138. Thus, "a court may employ subsection (c)(4) to certify a class as to liability regardless of whether the claim as a whole satisfies Rule 23(b)(3)'s predominance requirement." *Augustin v. Jablonsky* (*In re Nassau Cty. Strip Search Cases*), 461 F.3d 219, 227–30 (2d Cir. 2006) (employing predominance analysis in considering whether certification is warranted under Rule 23(c)(4)).[11]

---

[11] Defendants argue that Plaintiffs "ha[ve] already admitted to the Court on several occasions that [they] cannot satisfy the requirements under Rule 23(b)(3)." (Dkt. No. 134, at 1). The Court does not understand Plaintiffs to have conceded that they cannot meet the requirements of Rule 23(b)(3) as to the issue of liability. In their initial class certification briefing, Plaintiffs acknowledged that "certification of a damages class will be difficult, given the lack of predominance of the proposed class members' injuries." (Dkt. No. 74, at 24–25; *see id.* at 15). Plaintiffs argued

## 1.    Predominance

### a.    Standard

"A district court may only certify a class under Federal Rule of Civil Procedure 23(b)(3) if 'questions of law or fact common to class members predominate over any questions affecting only individual members.'" *Petrobras*, 862 F.3d at 270. "This predominance requirement 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Langan v. Johnson & Johnson Consumer Cos., Inc.*, No. 17-1605, 2018 WL 3542624, at *6, 2018 U.S. App. LEXIS 20592, at *16 (2d Cir. July 24, 2018) (quoting *Mazzei v. Money Store*, 829 F.3d 260, 272 (2d Cir. 2016)). The predominance requirement is satisfied if: "(1) resolution of any material legal or factual questions can be achieved through generalized proof, and (2) these common issues are more substantial than the issues subject only to individualized proof." *Petrobas*, 862 F.3d at 270 (internal quotations, citations, and formatting omitted). The distinction between individual and common questions is "central to the predominance analysis." *Id.* The Supreme Court has explained that an "individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (alteration in original) (internal quotation marks omitted). The predominance requirement is "far more demanding" than the commonality

---

that certification on the issue of liability was nevertheless appropriate "given the common core issue in this case—whether detainees were being denied adequate nutrition by virtue of the unapproved menu changes implemented" by MCJ. (*Id.*). It does not appear that Plaintiffs' subsequent letter brief, conceding that they cannot satisfy the predominance and superiority inquiries, (Dkt. No. 123, at 3), refers to their inability to meet those requirements as to liability since Plaintiffs consistently sought class certification as to liability. And in this Circuit certification of particular issues is available under Rule 23(c)(4) regardless of whether the claim as a whole satisfies Rule 23(b)(3)'s predominance requirement. *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 108–09 (2d Cir. 2007). The Court therefore does not deem Plaintiffs to have admitted the absence of predominance or superiority as to liability.

requirement under Rule 23(a), and it is not satisfied "simply by showing that the class claims are framed by the common harm suffered by potential plaintiffs." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624 (1997).

"Where individualized questions permeate the litigation, those 'fatal dissimilarit[ies]' among putative class members 'make use of the class-action device inefficient or unfair.'" *Petrobras*, 862 F.3d at 270 (quoting *Amgen Inc.*, 568 U.S. at 470). "The predominance inquiry mitigates this risk by 'ask[ing] whether the common, aggregation-enabling, issues in the case are *more prevalent or important* than the non-common, aggregation-defeating, individual issues." *Petrobras*, 862 F.3d at 270 (quoting *Tyson Foods*, 136 S. Ct. at 1045). For this reason, courts must give "careful scrutiny to the relation between common and individual questions in a case." *Tyson Foods*, 136 S. Ct. at 1045. "This analysis is more . . . qualitative than quantitative and must account for the nature and significance of the material common and individual issues in the case." *Petrobras*, 862 F.3d at 271 (internal quotation marks and citation omitted). In undertaking this analysis, the Court is mindful of its "'duty' . . . to 'take a close look' at whether the common legal questions predominate over individual ones." *Langan*, 2018 WL 3542624, at *7, 2018 U.S. App. LEXIS 20592, at *18 (quoting *Comcast*, 569 U.S. at 34).

### b.     Application

Plaintiffs argue that "common evidence will be used to show that Defendants engaged in a common course of unlawful conduct by providing insufficient nutrition to detainees on a class-wide basis, acting with indifference to the substantial risk posed by this conduct, and collectively depriving class members of sufficient nutrition and freedom from cruel and unusual punishment as safeguarded by the Eighth and Fourteenth Amendments." (Dkt. No. 131, at 2). Defendants argue that individualized proof is necessary in a conditions-of-confinement case in order to

comply with *Darnell*'s requirement that there be "a case by case assessment" and that class certification would therefore be improper. (Dkt. No. 125, at 4).

In *Darnell*, the Second Circuit ruled that the conditions of confinement for pretrial detainees held at a facility for less than twenty-four hours, without an actual serious injury or sickness, could rise to the level of a constitutional violation. *Darnell*, 849 F.3d at 36–38. Citing to *Willey v. Kirkpatrick*, 801 F.3d 51 (2d Cir. 2015), the Circuit noted that "unsanitary conditions of confinement must be assessed according to two components, severity and duration, on a case-by-case basis" and that, though "there are many exposures of inmates to unsanitary conditions that do not amount to a constitutional violation," there was no "'bright-line durational requirement for a viable unsanitary-conditions claim' or a 'minimal level of grotesquerie required' before such a claim could be brought." *Darnell*, 849 F.3d at 30–31 (quoting *Willey*, 801 F.3d at 66–68). The Circuit rejected "the defendants' theory . . . that state officials are free to set a system in place whereby they can subject pretrial detainees awaiting arraignment to absolutely atrocious conditions for twenty-four hour periods (and perhaps more) without violating the Constitution so long as nothing actually catastrophic happens during those periods." *Id*. at 37. The Circuit explained:

> That is not the law. As the District Court aptly stated in denying the defendants' motion to dismiss, "[o]ur Constitution and societal standards require more, even for incarcerated individuals, and especially for pretrial detainees who cannot be punished by the state." *Cano v. City of New York*, 44 F. Supp. 3d 324, 333 (2d Cir. 2014). This Court's cases are clear that conditions of confinement cases must be evaluated on a case-by-case basis according to severity and duration.

*Id*. A "case-by-case" analysis is thus necessary because there is no "bright-line durational requirement" for endurance of deplorable conditions before the conditions amount to a constitutional deprivation.

In this case Plaintiffs' claims arise from the same core allegation—that MCJ's practices and policies regarding meals posed an unreasonable risk of serious damage to their health—and the proposed class is limited to detainees who were incarcerated for at least two consecutive weeks. Accordingly, by considering the policy and practice MCJ employed in making menu substitutions and whether it regularly reduced portion sizes, and the frequency and impact such changes had on the diet it provided to inmates who had been incarcerated for at least two consecutive weeks at MCJ, the Court can comply with *Darnell's* requirement that the conditions of confinement be assessed based on severity and duration. *See, e.g.*, *Langley v. Coughlin*, 715 F. Supp. 522, 558 (S.D.N.Y. 1989) (rejecting argument for decertification of a class challenging the conditions of confinement in a Special Housing Unit ("SHU") because "proof of the nature and severity of conditions on SHU over an extended period is obviously best done in a single proceeding.")

Defendants argue that they were not deliberately indifferent to every inmate, citing to two inmates for whom they provided additional food. (Dkt. No. 88-18, at 28–29). Defendants have also noted that inmates who worked in the kitchen obtained double portions. (*Id*. at 17). However, the fact that Defendants may have individual defenses does not preclude a finding of predominance. "[A]lthough 'a defense may arise and may affect different class members different, [this] does not compel a finding that individual issues predominate over common ones.'" *Brown v. Kelly*, 609 F.3d 467, 485 (2d Cir. 2010) (quoting *In Re Nassau Cty. Strip Search Cases*, 461 F.3d at 225) (affirming finding of predominance in class action challenging blanket strip search policy "[i]n light of the pervasive character of the common liability issues and the admittedly *de minimis* nature of individualized liability issues," concerning whether the search of some of the plaintiffs was justified by reasonable suspicion)).

Defendants next contend that a class cannot be certified because the individuals who are currently incarcerated must exhaust their administrative remedies first and the exhaustion issue is individualized and fact-specific, and thus is a basis to deny class certification. (Dkt. No. 88-18, at 15). However, the Prison Litigation Reform Act's exhaustion requirement, codified at 42 U.S.C. § 1997e(a), is inapplicable to Hill because he was not incarcerated at the time this action was filed. *See Greig v. Goord*, 169 F.3d 165, 167 (2d Cir. 1999) ("[L]itigants . . . who file prison condition actions after release from confinement are no longer 'prisoners' for purposes of § 1997e(a) and, therefore, need not satisfy the exhaustion requirements."). It is also inapplicable to Rogers because he was not incarcerated at the time he moved to intervene. (Dkt. No. 128, at 13–16). Moreover, "although a defense may arise and may affect different class members differently, [this occurrence] does not compel a finding that individual issues predominate over common ones." *In re Nassau Cty.*, 461 F.3d at 225 (alteration in original) (internal quotation marks omitted). "So long as a sufficient constellation of common issues binds class members together, variations in the sources and application of a defense will not automatically foreclose class certification." *Id.* (internal quotation marks omitted).

The Second Circuit has noted that "where plaintiffs are 'allegedly aggrieved by a single policy of the defendants' and there is a 'strong commonality of the violation and the harm,' this 'is precisely the type of situation for which the class action device is suited.'" *Brown*, 609 F.3d at 484 (quoting *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 146 (2d Cir. 2001)) (affirming district court's determination that common issues predominated in class challenging the defendants' continued enforcement of a loitering law that Second Circuit had found unconstitutional); *MacNamara v. City of New York*, 275 F.R.D. 125, 146 (S.D.N.Y. 2011) (finding that common liability issues predominate in claim based upon policy or practice of

conducting mass arrests). In this case, the Court finds that the following questions are common to the proposed class: (1) whether the substitutions routinely made with respect to the meals provided to MCJ inmates were nutritionally and calorically adequate; (2) whether portions were routinely reduced; (3) whether the inadequacy of the meals was sufficiently serious so as to constitute objective deprivations in violation of the Eighth and Fourteenth Amendment; (4) whether, as required to establish a violation of the Eighth Amendment, Defendants were aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and drew that inference;[12] (5) whether, as required to establish a violation of the Fourteenth Amendment, Defendants acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed even though they knew, or should have known, that the condition posed an excessive risk to health or safety; and (6) whether MCJ had a policy or practice of subjecting detainees to an unlawful condition of confinement in violation of the Eighth and Fourteenth Amendment. Resolution of these factual and legal issues will inform the analysis with respect to each class member, whether a pretrial detainee or convicted prisoner. The Court finds that these issues predominate over the issues requiring individualized proof, which will include, as Defendants argue, issues concerning each class member's damages—"the different reaction that each inmate had to the diet at the jail" or whether there were "different reasons as to why someone lost weight (stress, medical conditions, drug use, etc.)." (Dkt. No. 125, at 4). *See Butler*, 289 F.R.D. at 102 (finding the question of whether the conditions at the jails were "cruel and inhuman in violation of the Eighth and Fourteenth Amendments" and whether the defendants "were deliberately indifferent

---

[12] Although "deliberate indifference . . . must be assessed on an individualized basis with respect to each plaintiff," *Darnell*, 849 F.3d at 38, the plaintiffs' "effort to prove the defendants' indifference will necessarily require each class member to rely on the same body of evidence . . . [and] adds a large body of common issues of both fact and law . . . thus further enhancing the appropriateness of class treatment." *Langley v. Coughlin*, 715 F. Supp. 522, 560 (S.D.N.Y. 1989).

predominate[d] over the issues subject to individualized proof—namely the extent of each class members' damages").

### 2. Superiority

#### a. Standard

In order to certify a class under Rule 23(b)(3), the Court must determine whether "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In doing so, the Court considers factors including: (1) "the class members' interests in individually controlling the prosecution or defense of separate actions"; (2) "the extent and nature of any litigation concerning the controversy already begun by or against members of the class"; (3) "the desirability or undesirability of concentrating the litigation in the particular forum"; and (4) "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(A)–(D). The Court concludes that these factors favor class certification.

#### b. Application

First, there is no indication that potential class members have an interest in maintaining separate actions and, without class notification, they may not be aware of the existence of a claim in connection with the conditions of confinement that they experienced or continue to experience at the MCJ. Second, the parties have conducted extensive litigation in connection with this case as to liability. Third, it is highly desirable to concentrate the litigation into a single forum because it will "simplif[y] and streamline[] the litigation process." *In re Nassau Cnty.*, 461 F.3d at 230. Fourth, while some individualized inquiries may be required where class members have received different diets than that of the general population of detainees, the inquiries can be managed efficiently through objective measures by determining whether the detainee at any point was subject to the general diet for at least two weeks. Accordingly, the Court concludes that proceeding as a class action as to liability is "superior to other methods for fairly and

efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). *See In re Nassau Cnty.*, 461

F.3d at 230.

**VI.    CONCLUSION**

For these reasons, it is

**ORDERED** that Plaintiffs' motion for class certification (Dkt. No. 106) is **GRANTED**

as to a liability class under Rules 23(b)(3) and (c)(4) and that the following Primary Class and

Sub-Classes are certified:

> Primary Class
>
> All detainees who have been or will be placed into the custody of the Montgomery County Jail and were detained for at least two consecutive weeks. The class period commences on July 24, 2011, and extends to the date on which Montgomery County is enjoined from, or otherwise ceases, enforcing its policy, practice and custom of refusing to provide an appropriate amount of nutritional sustenance to all detainees admitted to the Montgomery County Jail. Specifically excluded from the class are Defendant and any and all of its respective affiliates, legal representatives, heirs, successors, employees or assignees.
>
> > Pre-Trial Detainee Sub-Class
> >
> > All members of the Primary Class but who were housed as a Pre-Trial Detainee, in that they had not yet been convicted of their charges.
> >
> > Post-Trial Detainee Sub-Class
> >
> > All members of the Primary Class, but who were housed as a Post-Trial Detainee, in that they had been convicted of their charges, either by a plea or jury trial.

It is further **ORDERED** that Plaintiffs Perry Hill and James Rogers are appointed the

class representatives; and it is further

**ORDERED** that Plaintiffs' attorneys of record are appointed class counsel.

**IT IS SO ORDERED.**

**Dated:  August 20, 2018**

Brenda K. Sannes
U.S. District Judge