**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

PERRY HILL and JAMES ROGERS, both individually
and on behalf of a class of others similarly situated,

                            Plaintiffs,

v.

COUNTY OF MONTGOMERY, MICHAEL AMATO,
and MICHAEL FRANKO,

                            Defendants.

9:14-cv-00933 (BKS/DJS)

_____

**APPEARANCES:**

_For Plaintiffs:_
Law Offices of Elmer Robert Keach, III, P.C.
Elmer Robert Keach, III
Maria K. Dyson
One Pine West Plaza, Suite 109
Albany, NY 12205

Migliaccio & Rathod LLP
Nicholas A. Migliaccio
412 H Street N.E., Suite 302
Washington, DC 20002

_For Defendants:_
Goldberg Segalla LLP
Jonathan M. Bernstein
8 Southwoods Boulevard, Suite 300
Albany, NY 12211

**Hon. Brenda K. Sannes, United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I.      INTRODUCTION

Plaintiffs Perry Hill and James Rogers bring this conditions-of-confinement class action[1] under 42 U.S.C. § 1983 against Defendants County of Montgomery, Michael Amato, and Michael Franko. (Dkt. No. 136). Plaintiffs allege that Defendants failed to provide adequate nutrition while they were in the Montgomery County Jail ("MCJ") in Fultonville, New York, in violation of the Eighth and Fourteenth Amendments. (Dkt. No. 136). Presently before the Court is Defendants' motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. (Dkt. No. 174). Plaintiffs oppose the motion. (Dkt. Nos. 180, 181, 185). For the following reasons, Defendants' motion is denied.

## II.      FACTS[2]

### A.      Montgomery County Jail

MCJ is a 177-bed facility that houses approximately 1,000 pretrial detainees and convicted prisoners each year. (Dkt. No. 174-12, at 46; Dkt. No. 174-7, at 37). Defendant Amato was the Sheriff of Montgomery County and in charge of the MCJ through 2018.[3] (Dkt. No. 174-7, at 111). "Any policy at the jail is set by the Sheriff." (Dkt. No. 174-44, ¶ 2). There is a sign in the MCJ booking room that says: "Welcome to Hotel Amato. No thrills. No frills. Don't come

---

[1] On August 20, 2018, the Court granted Plaintiffs' renewed motion for class certification and certified a primary class and pre-trial and post-trial detainee sub-classes under Rules 23(b)(3) and (c)(4). *Hill v. Cty. of Montgomery*, No. 14-cv-933, 2018 WL 3979590 (N.D.N.Y. Aug. 20, 2018); (Dkt. No. 139). The class period "commences on July 24, 2011, and extends to the date on which Montgomery County . . . ceases[ ] enforcing its policy . . .  of refusing to provide an appropriate amount of nutritional sustenance to all detainees." *Hill*, 2018 WL 3979590, at *14. The parties represent that the number of class members is in the thousands.

[2] The facts have been drawn from Defendants' statement of material facts, (Dkt. No. 174-2), Plaintiffs' response, (Dkt. No. 181), and the attached exhibits and affidavits to these documents. The facts are taken in the light most favorable to Plaintiffs.

[3] The current Sheriff of Montgomery County has not been named as a defendant in this case.

back if you don't like it."[4] (Dkt. No. 174-7 at 33). Defendant Franko was the jail administrator, and supervised MCJ through 2015. (Dkt. No. 174-12, at 65). Robert Barbuti, the MCJ jail administrator since 2016, is not a defendant in this case.[5] (Dkt. No. 174-44, ¶ 1).

### 1. Trinity Services Group

In 2010, MCJ contracted with Trinity Services Group ("Trinity"), a food service provider, (Dkt. No. 174-11, ¶ 2; Dkt. No. 174-12, at 131), which allowed MCJ access to Trinity's food suppliers and better pricing. (Dkt. No. 174-12, at 208). Through Trinity, MCJ reduced the cost per meal from approximately $2.00 to $1.07 or $1.10. (Dkt. No. 174-12, at 133). Trinity also provided a dietician and worked with Franko and others at MCJ "in developing a program that worked for the jail." (Dkt. No. 174-12, at 131). Franko had discussions with Trinity regarding "caloric intake," which was set at approximately 2,900 calories per day. (Dkt. No. 174-12, at 134, 26). Lynn Dumar, a cook at MCJ, testified that she did not think the food quality with Trinity "was any worse" and that it was "all still USDA approved" but that there were some differences—the hot dogs, for example, were "probably not the same quality that we got before." (Dkt. No. 174-8, at 13–14).

### 2. Kitchen Staff and Menus

Three full-time cooks, at least one part-time cook, and inmate workers staff the kitchen at MCJ. (Dkt. No. 180-9, at 11, 18–19). A Trinity dietitian sets the MCJ menu, which operates on a

---

[4] Amato put the sign there "[s]o people know" "[t]hat they're not going to get everything under the sun in this jail" and "understand when they come to the jail not to expect anything extra." (Dkt. No. 174-7, at 34).

[5] Barbuti submitted an affidavit in support of the motion for summary judgment stating that the Sheriff sets all policy at the jail, including policies concerning "meal production and operation of the kitchen," and that "[t]he Jail Administrator does not set any policy at the jail." (Dkt. No. 174-44, ¶ 2).

four-week cycle, and specifies the serving sizes.[6] (Dkt. No. 75-3, at 10, 58; Dkt. No. 180-30, Dkt. No. 180-6, at 23). Cooks or inmates cook the meals from scratch. (Dkt. No. 180-6, at 21).

MCJ provides inmates with three meals each day; breakfast is served at 6:30 a.m. or 7:00 a.m., lunch is served at noon, and dinner is served at 4:00 p.m. or 5:00 p.m. (Dkt. No. 175-37, at 36; Dkt. No. 180-6, at 34–35; Dkt. No. 190-6, at 34). Because of this schedule, inmates often go approximately 14 hours between dinner and breakfast the next day. In general, MCJ provides no snacks between meals and the commissary has not sold food since 2008. (Dkt. No. 174-7, at 36–37). Thus, for many class members, daily meals were the only food source.[7] (Dkt. No. 174-7, at 80).

MCJ food production records indicate that a typical breakfast consisted of oatmeal (1 cup) or cereal (1 cup), a breakfast cake or muffin, and a carton of 1% milk. (Dkt. No. 174-49, at 2; 174-51, at 17). Lunch consisted of a chicken patty, fruit sauce (1/4 cup),[8] carrots (1/2 cup), rice (3/4 cup), a cookie, 2 ounces of margarine, 2 slices of white bread, and fruit punch (1 cup). (Dkt. No. 174-51, at 14). Dinner consisted of meat stroganoff (3/4 cup), pasta (1 cup), corn (1/2 cup), 2 slices of white bread, 1 ounce of margarine, pudding (1/2 cup), and fruit punch (1 cup). (Dkt. No. 174-49, at 4). Trinity requires the jail to substitute items where specific menu items are unavailable—if food has spoiled, for instance. (Dkt. No. 174-12, at 111). The MCJ "cooks are aware" that if substitutions are necessary, the substituted item must be the same type as the original—"that they have to trade a protein for a protein, and a starch for a starch." (Dkt. No. 174-12, at 111). No one from Trinity reviews substitution decisions. (Dkt. No. 174-8, at 94). A

---

[6] Amato testified that the MCJ kitchen staff and Trinity "put together" the diet. (Dkt. No. 75-2, at 56).

[7] Sometime after the commencement of this action, MCJ began allowing inmates to purchase one sandwich twice per week. (Dkt. No. 174-7, at 80).

[8] Dumar, one of the cooks at MCJ, acknowledged that while inmates were "allowed a half a cup portion of fruit," there were days when no fruit was provided. (Dkt. No. 174-8, at 15).

food production sheet is filled out for every meal, and if there is a substitution, it is usually noted. (Dkt. No. 174-8, at 93).

### 3. Edibility, Substitutions, and Portion Reductions

There is evidence, however, that not all the food was edible, that substitutions were of inferior nutritional or caloric value, that sauces and gravies were watered down, and that three to four times per week, portions were reduced when the kitchen ran out of food. The chicken served at MCJ, for example, "was . . . mechanically separated chicken"— "frozen" "pink gel" that "[c]omes in a 40-pound box" labeled "for institutional use only." (Dkt. No. 180-6, at 20, 75). And there were vegetables that, according to the box, "had no nutritional value to them." (Dkt. No. 180-6, at 75; *see also* Dkt. No. 180-3, at 23–24 (inmate testifying that meat was rotten and that she "could see it was turning," the salad was "[b]rown" and slimy, and the vegetables were rotten); Dkt. No. 174-39, at 19–20) (inmate testifying that the "[f]ood was not edible" and it made her "nauseous after [she] ate it"); Dkt. No. 174-39, at 21 (inmate testifying that she could not eat the "baloney" or "pastrami, or whatever it was" because "it was not edible, it did not taste well"); Dkt. No. 174-39, at 33 (inmate describing food as "inedible," including "watered-down oatmeal with no sugar," powdered milk, unsweetened Kool-Aid, "[p]ancakes, which aren't pancakes, sometimes were cooked and others not," "soy burgers," and stating that "the baloney and salami" were the "worst"); Dkt. No. 174-38, at 14–15 (inmate testifying that the oatmeal had "no flavor" and the tacos were made out of "soy food" and did not look good)).[9]

Further, there is evidence that the kitchen at times failed to provide any substitution for planned menu items that became unavailable. (Dkt. No. 180-34, at 2, 31, 84, 86). For example,

---

[9] Dumar stated that she believed that "the dairy drink" served to the inmates was soy-based, though that she was "not 100 percent sure on that," but that none of the meat was soy-based. (Dkt. No. 174-8, at 44).

according to the food production record from January 29, 2013, the lunch menu required a cookie, but it was crossed out and not served (Dkt. No. 180-34, at 2); (*see also* Dkt. No. 180-34 (February 7, 2013, dinner menu, cookie crossed out); Dkt. No. 180-34, at 84 (February 25, 2013, dinner menu, gravy crossed out)).

To portion the food on individual food trays, the kitchen used ladles in different sizes— a one-cup ladle for the main serving and a one-half cup ladle for vegetables. (Dkt. No. 180-7, at 12, 32). In general, the cook would instruct the inmates serving the food to fill the ladle "all the way up." (Dkt. No. 180-7, at 13, 16). Three or four times a week, however, when the food the kitchen had prepared "was running low," the cook would tell the inmates serving the food "to give less" and the inmates would fill the ladles halfway, instead of fully. (Dkt. No. 180-7, at 13, 16 (former inmate worker testifying that "instead of giving them one cup ladle," when food ran low, he would "give them like a half a cup"); (Dkt. No. 180-6, at 15) (inmate worker testifying that three to four times each week, the kitchen would begin to run out of food and the cook would instruct the inmate workers to "skimp it down" and give a half-cup ladle instead of a full-cup ladle)).[10] If the kitchen began to run out of a sauce or gravy during food service, which happened "two to three times a week," the cook would instruct the inmate workers to add water to the sauces and gravies to "stretch it." (Dkt. No. 180-6, at 64–66).

### B.    Plaintiff Perry Hill

Hill was in MCJ from September 2013 to March 2014 for a parole violation. (Dkt. No. 174-26, at 17). Hill testified that he weighed approximately 160 pounds when he entered MCJ and 134 pounds when he left. (Dkt. No. 174-26, at 73). Hill stated that he believed that the diet

---

[10] Kenneth Crouse, who worked in the kitchen as an inmate, stated that when the kitchen ran out of food, it would be because "[t]here wasn't enough cooked" and that it was not because there was not enough food on the premises. (Dkt. No. 180-7, at 27).

provided, including the meat, was soy-based. (Dkt. No. 174-26, at 80). He was "always" hungry. (Dkt. No. 174-26, at 39). Hill testified that he complained "[a]ll the time" to correctional officers about there being "so little food" but that he never received a response. (Dkt. No. 174-26, at 40). Hill testified that he ate cocoa butter sticks, vitamins that he purchased from the commissary, and toothpaste to supplement his diet. (Dkt. No. 174-26, at 55).

Hill testified that he had no medical conditions prior to entering MCJ. (Dkt. No. 174-26, at 27). Hill testified that he was depressed about "being in" MCJ and "going through starvation." (Dkt. No. 174-26, at 81). Hill lost hair and experienced receding and bleeding gums, dizziness, and nausea at MCJ. (*Id*. at 56–59). Hill witnessed "multiple fights" over food. (Dkt. No. 174-26, at 49, 59–60). Hill testified that he "worked out his whole life" but stopped working out while at MCJ because "you can't build muscle if you're not eating." (Dkt. No. 174-26, at 63). Hill testified that he had difficulty sleeping because he was "hungry" and the "sleeping conditions" were "poor." (Dkt. No. 174-26, at 83).

### C.     Plaintiff James Rogers

Rogers was in MCJ from February 2013 to October 2013 and June 2014 to February 2015. (Dkt. No. 174-27, at 19–20, 35). He was arrested in June 2014, pled guilty in November 2014, and remained at MCJ until February 2015. (Dkt. No. 174-27, at 32–33). Rogers could not recall what he weighed when he entered the jail. (Dkt. No. 174-27, at 18). He lost "[a] little bit" of weight while he was in MCJ; he did not know how much, but he was "thinner" and "felt a little weaker" when he left the jail.  (Dkt. No. 174-27, at 21–22). Rogers, who worked in the kitchen, testified that one of the issues he had with the food was that the "meat in the goulash didn't taste like meat" and that he knew from talking to the kitchen staff that the meat was soy-based. (Dkt. No. 174-27, at 57). Rogers testified that he and others filed grievances "that the food wasn't healthy enough." (Dkt. No. 174-27, at 43). Rogers testified that he was hungry "most of

the day" while at MCJ even though he received three meals per day. (Dkt. No. 174-27, at 56). Rogers suffered hair loss while at the jail. (Dkt. No. 174-27, at 64).

### D. Other Inmates

In support of their opposition to the motion, Plaintiffs submitted the deposition testimony of several other individuals (pretrial detainees and convicted prisoners) who spent more than two weeks in MCJ during the proposed class period.[11] The Court briefly outlines that testimony below.

#### 1. Kenneth Crouse

Kenneth Crouse was in MCJ every year between 2011 and 2015. (Dkt. No. 180-7, at 9). Although he worked in the kitchen and was entitled to double portions, (Dkt. No. 180-7, at 11), when the kitchen ran out of food, he would not receive double portions and "got stuck eating" two "[p]eanut butter and jelly sandwiches most of the time." (Dkt. No. 180-7, at 13–15). Crouse stated that in general, he would enter the jail weighing between 136 and 144 pounds and would weigh "120, 122" when he left. (Dkt. No. 180-7, at 18). Crouse testified that he would lose hair whenever he was in MCJ. (Dkt. No. 180-7, at 24). Crouse stated that was no fresh fruit or dairy products and that MCJ used "powdered creamer, soy creamer." (Dkt. No. 180-7, at 39).

#### 2. Joanne Strobel

Joanne Strobel was in MCJ from 2012 to 2013 for ten months, (Dkt. No. 174-39, at 8–9), during which time, she estimates, she lost 50 pounds. (Dkt. No. 174-39, at 14). Strobel often did not eat breakfast because the "[f]ood was not edible" and it made her "nauseous after [she] ate it." (Dkt. No. 174-39, at 19–20). At lunch, Strobel tried to eat everything on her tray, but she

---

[11] While most class members testified to losing weight, there is evidence that some gained weight. Eduardo Oquendo, for example, was in MCJ as a sentenced prisoner in 2015 and gained approximately 20 pounds during his incarceration. (Dkt. No. 174-23, at 6–7, 10). He testified that he was a heroin user before entering jail and was not eating regularly. (Dkt. No. 174-23, at 19).

could not eat the "baloney" or "pastrami, or whatever it was" because "it was not edible, it did not taste well." (Dkt. No. 174-39, at 21). Strobel filed a "group grievance," which described the food as "inedible," and complained about the "watered-down oatmeal with no sugar," powdered milk, unsweetened Kool-Aid, "[p]ancakes, which aren't pancakes, sometimes were cooked and others not," "soy burgers," and "the baloney and salami." (Dkt. No. 174-39, at 33). While she was in MCJ, Strobel "had no energy," "was tired," and "wanted to sleep." (Dkt. No. 174-39, at 35). She ate toothpaste. (Dkt. No. 174-39, at 35).

### 3. Robert Pettit

Robert Pettit testified that while he was in MCJ during 2012 and 2013,[12] the meals did not fill him up, he was hungry all day every day, he felt weak, and he lost hair due to "[l]ack of food." (Dkt. No. 75-10, at 46, 63). Pettit weighed approximately 250 pounds when he arrived at MCJ, began losing weight at "the end of 2012," and by the time he left MCJ in early 2013, weighed approximately 198 pounds. (Dkt. No. 180-18, at 18, 20). Pettit "lost so much weight" that eventually his prosthetic leg no longer fit, and though he asked MCJ to purchase "stump socks," which would have allowed the prosthetic to fit correctly, MCJ instead took the prosthetic away and put Pettit in the medical unit. (Dkt. No. 180-18, at 27–28). Pettit filed grievances concerning his weight loss. (Dkt. No. 180-36). In response, Pettit received Ensure and a peanut butter sandwich for "[a] couple days." (Dkt. No. 180-18, at 33–34, 40). After that, he received "double meals" for three days, until Sheriff Amato stopped the double meals. (Dkt. No. 180-18, at 34–35). Pettit testified that a correctional officer informed him that Sheriff Amato was in the

---

[12] Pettit appears to have been a pretrial detainee during some of the time he was at MCJ in 2012 and 2013. (Dkt. No. 75-10, at 8–9).

kitchen and saw Pettit's name on the bulletin board along with the double-meal designation, and that Sheriff Amato took Pettit's name off the bulletin board. (Dkt. No. 180-18, at 35).

### 4. David Canales

David Canales was in MCJ from 2012 to 2013. (Dkt. No. 174-38, at 9–11). Canales testified that the portions there were "small" and there were certain foods, like oatmeal, which had "no flavor," that he would not eat. (Dkt. No. 174-38, at 14–15). Canales described the tacos as being made of "soy food." (Dkt. No. 174-38, at 14–15). While he was there, he ate toothpaste and toilet paper because he was hungry. (Dkt. No. 174-38, at 34). Canales submitted a grievance complaining that he had lost approximately 20 pounds while in MCJ. (Dkt. No. 174-38, at 36). His grievance was denied. (Dkt. No. 178-38, at 38).

### 5. Carolyn Lee Ardizzone

Carolyn Lee Ardizzone testified that she was in MCJ for two, two-week periods in 2013 for violations of probation. (Dkt. No. 180-3, at 12, 14). Ardizzone testified that she lost weight while in MCJ, but that she did not know how much,[13] and that she lost weight because there "wasn't enough food, and the food they gave us was pretty disgusting, so I didn't eat most of the time." (Dkt. No. 180-3, at 22). Ardizzone testified the meat was rotten and that she "could see it was turning," the salad was "[b]rown" and slimy, and the vegetables were rotten. (Dkt. No. 180-3, at 23–24). Ardizzone complained to the corrections officers. (Dkt. No. 180-3, at 24). Ardizzone testified that the portions on each tray were often different, and inmates would "fight over the bigger portions on the tray." (Dkt. No. 180-3, at 26).

---

[13] When pressed further, Ardizzone testified that she lost "roughly 60 pounds." (Dkt. No. 180-3, at 29).

### 6. Kyle Edick

Kyle Edick testified that he was in MCJ in 2013 for four months, waiting "to get off parole," and again for four months in 2014, before going to state prison. (Dkt. No. 180-10, at 9, 13, 15, 18). In 2013, Edick tried to go on a special diet because "every night [he] would go to bed hungry, starving" because "[t]hey served dinner too early there." (Dkt. No. 180-10, at 25). Edick hoped that the jail would give him a "smoothie, because [h]e was losing weight and [he] was starving," but he was unsuccessful. (Dkt. No. 180-10, at 25).

### 7. Andre Cruz

Andre Cruz was in MCJ a number of times, including in 2013 and 2014. (Dkt. No. 174-37, at 34). Cruz testified that: "The last meal was at maybe quarter to 5 there, 5 o'clock. We don't eat again until the next day around 7. So, we ate toothpaste, we ordered Halls from commissary before they took that away just to kind of not starve." (Dkt. No. 174-37, at 36). Cruz explained that the Halls cough drops and toothpaste "helped you make it get through to the next day. Just substance." (Dkt. No. 174-37, at 40).

### 8. Robert Staley

Robert Staley, who was in MCJ in 2014, testified that he "used to eat toothpaste, chew paper" in MCJ. (Dkt. No. 174-24, at 16, 18).

### 9. Eric Engle

Eric Engle testified that he was in MCJ in 2015 for an eight-month sentence. (Dkt. No. 174-19, at 8). He worked in the kitchen while he was there, (Dkt. No. 174-19, at 8–9), but still found that the portions were "incredibly small and he was . . . extremely hungry." (Dkt. No. 174-19, at 15). Engle stated that he had his "wife put money in other people's accounts" so that he could "buy their trays" but found that, even with two trays, he "wouldn't get full." (Dkt. No. 174-19, at 16). Engle testified that "everyone" complained about the portion sizes. (Dkt. No.

174-19, at 35). He stated that, for example, breakfast might be a "very small scoop of oatmeal," (Dkt. No. 174-19, at 18), and lunch was a "pretty small" serving of "mechanically processed chicken," a "small vegetable," a "small fruit," bread, a glass of Kool-Aid, and "every now and then" a cookie. (Dkt. No. 174-19, at 19, 23). Engle stated that he complained but that "the only answers I was getting from the kitchen staff, most of the guards didn't know that is what was decided by the jail administrator, it was enough calorie intake and you are not going to get any more." (Dkt. No. 174-19, at 70).

### 10. Joseph Chirico

Joseph Chirico testified that he was last incarcerated at MCJ in 2018 for eight months.[14] (Dkt. No. 180-6, at 7–8, 10). Chirico worked in the kitchen as a cook's helper. (Dkt. No. 180-6, at 14–15). According to Chirico, "80 percent of the time" the food was not edible. (Dkt. No. 180-6, at 20). Chirico explained that this was because of "the type of food it was . . . mechanically separated chicken," which he described as "frozen" "pink gel" that "[c]omes in a 40-pound box" labeled "for institutional use only." (Dkt. No. 180-6, at 20, 75). Chirico spoke to one of the cooks, about "how bad the mechanically separated chicken was," and stated that the cook agreed with him and "would not touch it" herself. (Dkt. No. 180-6, at 22). Chirico had access to the food packaging and the "calories and the nutritional value on the food" and "kept track" of his food intake at MCJ and estimated that he averaged 900–1,100 calories per day. (Dkt. No. 180-6, at 37–38). Chirico testified that when he checked the labels on the food packaging, he noticed that "[v]egetables had no nutritional value to them. They'd say it right on the box." (Dkt. No. 180-6, at 75).

---

[14] Chirico was in MCJ for "failure to pay a restitution fine." (Dkt. No. 180-6, at 7–8, 10). On December 4, 2018, Chirico was sentenced to time served and released. (*Id.* at 31). The underlying charge—for which the restitution fine or surcharge was imposed—was petit larceny. (Dkt. No. 180-6, at 41). Chirico stayed in MCJ in lieu of paying the surcharge. (Dkt. No. 180-6, at 44).

Even though Chirico worked in the kitchen and received double meals, "[a] lot of the times" he was hungry and drank "[a] lot of water" as a substitute for food. (Dkt. No. 180-6, at 14–15, 33). Chirico ate his last meal at 4:00 p.m., and was usually hungry by 8:00 p.m. (Dkt. No. 180-6, at 34). Chirico's gums bled while he was in MCJ, he did not know whether it was attributable to the toothpaste, which did not have fluoride. (Dkt. No. 180-6, at 55).

Chirico weighed 250 or 260 pounds when he entered MCJ and 225 pounds when he left, eight months later. (Dkt. No. 180-6, at 13). "[T]hree or four different times," Chirico submitted written requests to be weighed to the corrections officers assigned to his pod, but never received a response. (Dkt. No. 180-6, at 68–69). The corrections officers told him that his requests to be weighed were not being responded to "[b]ecause of this lawsuit" and that he could not "get weighed" there. (Dkt. No. 180-6, at 69). According to Chirico, correctional officers called MCJ "Mount Hungry" and told inmates they were "going to be put on the Montgomery County diet when you come into the jail." (Dkt. No. 180-6, at 70).

### E.    Grievances

Plaintiffs have presented evidence that between 2013 and 2015, MCJ inmates filed at least 39 grievances concerning food.[15] (Dkt. Nos 180-27, 180-28, 180-29). In them, inmates complain: that "food portions are too small," (Dkt. No. 180-27, at 2), of not being "fed properly" and having lost weight, (Dkt. No. 180-27, at 3), of needing "bigger portions of food" and stomach pain and that the "trays are under the state minimum," (Dkt. No. 180-27, at 6), of going "to sleep really hungry" every night and being unable to sleep, (Dkt. No. 180-27, at 8), of the small portions and the 14-hour stretch between dinner and breakfast and waking up "many times

---

[15] Plaintiffs have also submitted grievances from 2011 and 2012. (Dkt. Nos. 180-25, 180-26). As the grievances from 2013–2015 suffice to show Defendants were on notice about food complaints, the Court need not summarize the earlier grievances.

through out the night hungry," (Dkt. No. 180-27, at 9), that the "portions aren't enough to feed a toddler," (Dkt. No. 180-27, at 10), of losing "15 pounds," (Dkt. No. 180-27, at 11), and requesting "more food portions . . . so we are not starving from meal to meal," (Dkt. No. 180-27, at 12).

In response to the grievances, the grievance coordinator often cited "NYS Min. Std., section 7009.2 (A)(B)."[16] (*See*, *e.g.*, Dkt. No. 180-35, at 4, 7). For example, inmate Raymond Pinney filed a grievance requesting "more portions of food in this facility. Even four pieces of bread for lunch and dinner would be suffice [sic]. What's next giving us bread and water?" (Dkt. No. 180-35, at 7). In response, the grievance coordinator wrote: "NYS Min Std, Section 7009.2 (A)(B)." (Dkt. No. 180-35, at 7). Franko reviewed "the grievance and the response" and deemed the grievance officer's response "correct."[17] (Dkt. No. 180-35, at 5). Franko wrote that he "noticed that your description can only be construed as somewhat subjective and relates to your perception. Also, I can only assume that your question is rhetorical: To advise, there is no plan to change the menus at this time." (Dkt. No. 180-35, at 5). Franko further advised that "if a meal is served that is obviously not at the proper temperature or a diminished (or increased) amount, you

---

[16] This is a reference to the "Nutritional adequacy" regulation applicable to county jails, it states:

> (a) The food service program in each local correctional facility shall ensure that all prisoners are provided with an appropriate level of nutrients and calories. Such appropriate level of nutrients and calories shall be based upon current recommended dietary allowances of the Food and Nutrition Board of the National Academy of Sciences, National Research Council.

> (b) The person responsible for the supervision of the facility food service program shall plan and prepare written and dated menus. Such menus shall be reviewed at least annually by a nutritionist or dietician certified by the State Education Department to ensure that they provide an appropriate level of nutrients and calories.

9 N.Y.C.R.R. § 7009.2.

[17] Franko only became involved in a grievance if the inmate "appealed it," at which point he would "review the investigation done by the grievance officer's response and they would appeal it to me." (Dkt. No. 174-12, at 141).

must notify staff immediately in an attempt to rectify the situation." (Dkt. No. 180-35, at 5).

Franko wrote nearly identical responses to other grievances. (*See* Dkt. No. 180-35, at 9–11).

In addition to responding to grievances, Franko sent a memorandum dated November 5, 2013, to kitchen and supervisory staff advising:

> I have recently received several grievances in regard to issues with food.
>
> Merely as a reminder, should a situation occur regarding a meal, the CO should notify the Shift Supervisor immediately. The Supervisor should bring the meal to the attention of the Cook and together determine the course of action.
>
> Again, based on some of the Sheriff's directives, meals are of great importance. Portion size, temperatures, and preparation methods need to be strictly adhered to. Should a problem arise that may not be solved easily, seal and save the meal in question for later review and replace to only the appropriate amount, if reasonable or necessary. The Shift Supervisor shall document all issues on their report or should there be a need, document all in an incident/blotter.

(Dkt. No. 180-35, at 2). In a memorandum dated November 12, 2013, Franko wrote to the grievance coordinator regarding "Meal/Food Issues/Grievances" and stated that he had "responded to all of the above [grievances] and found to agree with your decision" and that "[e]xtra time was spent to investigate each and the Sheriff reviewed all info as well." (Dkt. No. 180-35, at 3).

### F. Defendant Michael Amato

Defendant Michael Amato, the Sheriff of Montgomery County, testified that when he was sheriff, Amato was in MCJ "probably every other day." (Dkt. No. 174-7, at 15). Amato was aware as of 2013 that inmates had complained about the portion sizes of the food at MCJ. (Dkt. No. 174-7, at 78). Correctional officers also told him in 2013 that inmates were complaining that they wanted more food. (Dkt. No. 174-7, at 17). During his deposition, Amato testified that he knew that inmates were complaining that "they wanted more food," that "they wanted the

commissary back," and that "they were hungry." (Dkt. No. 174-7, at 10–11, 15). Amato stated that it was not a surprise that MCJ detainees were complaining about the food they were receiving because "they were asking for commissary after we had taken commissary away . . . They were asking for more food."[18] (Dkt. No. 174-7, at 19).

After the lawsuit was filed, Amato "made sure . . . the food portions were the right amount [and that] they were getting what they are required in calories every day." (Dkt. No. 174-7, at 20). He believed that New York regulations required inmates at MCJ to receive 2,200 calories per day, and that they received, on average, 2,900 calories per day. (Dkt. No. 174-7, at 9). Amato stated that the cooks are responsible for ensuring that detainees received appropriate portions. (Dkt. No. 174-7, ay 24). Amato also "double-checked with the jail administrator to make sure everything was done right." (Dkt. No. 174-7, at 24). He did not go into the kitchen himself to ensure proper portion sizes and did not recall speaking to kitchen workers or corrections officers about this lawsuit. (Dkt. No. 174-7, at 24, 28). He "might have" talked to his medical staff. (Dkt. No. 174-7, at 54). Amato believed that the "state approved what we were doing." (Dkt. No. 174-7, at 21). Amato stated that he also "had Trinity come to make sure everything was being done right." (Dkt. No. 174-7, at 156).

Eventually, MCJ began selling sandwiches "[t]o offset [the] commissary fund," which MCJ used "to pay for . . . TVs and the programming." (Dkt. No. 174-7, at 80). Amato denied that the sandwiches had do with this lawsuit or detainees' complaints of hunger. (Dkt. No. 174-7, at 81).

---

[18] MCJ discontinued the commissary several years before the commencement of this action after inmates were found "hoarding food in their cells, causing ants and other bugs," gambling with commissary items, and "stuffing the paper wrappings and other material between furniture, causing fire hazards." (Dkt. No. 174-7, at 36).

## G.     Defendant Michael Franko

Michael Franko, the MCJ Jail Administrator, testified that he was aware that there were "a number of grievances about food" and that inmates were complaining that they did not like the food and that they were not getting enough. (Dkt. No. 174-12, at 9, 13). In response to the complaint, Franko "investigated where appropriate and when appropriate" but found no "great discrepancy" and not "a lot of substance to" the inmates' complaints "that they didn't have enough food." (Dkt. No. 174-12, at 10). Prior to the lawsuit, MCJ contacted "the food services company . . . to make sure that . . . the menus were adequate and sufficient and more than the daily required amount that they're supposed to get." (Dkt. No. 174-12, at 85). Franko and Trinity "agreed that it was sufficient at the time, and we weren't going to give them additional food." (Dkt. No. 174-12, at 85).

When inmates directly complained to Franko that they were not getting enough food and that they did not like the food, Franko generally responded that MCJ "utilize[d] the food service company who makes sure that there is adequate caloric intake and that we do our best to monitor both the cooking and the distribution." (Dkt. No. 174-12, at 14).[19] Franko was not aware that inmates were eating cocoa butter sticks, toothpaste, or toilet paper. (Dkt. No. 174-12, at 31–32).

Franko stated that after learning a group of inmates had filed grievances complaining of weight loss, "we had them weighed by our medical staff" and "found that there was . . . no significant weight loss"—he did not consider "any of those losses" to be "substantial." (Dkt. No.

---

[19] Franko testified that price per meal prior to Trinity was "approaching $2 a meal," but that with Trinity, it was "just above a dollar." (Dkt. No. 174-12, at 133). Franko did not know whether there was a difference in the quality of the food once Trinity took over. (Dkt. No. 174-12, at 136). Franko explained that "One of the reasons we went with a food services company was because they had access to food suppliers and based upon the volume they were able to secure better pricing." (Dkt. No. 174-12, at 208).

174-12, at 142). According to Defendants, these inmates were weighed in 2014, six inmates were weighed and five lost weight; the weight loss ranged from 1 to 21 pounds. (Dkt. No. 88-1, at 72).

Franko stated that when he learned that Robert Pettit, an inmate, complained that he lost "around 90 pounds"—so much weight that he could not fit into his prosthetic leg, (Dkt. No. 174-12, at 10–11), he had the medical staff "look and see" to determine "whether he actually did fit into his prosthetic." (Dkt. No. 174-12, at 11). Franko's discussions with Pettit concerned "mobility and [were] not necessarily about" weight. (Dkt. No. 174-12, at 149).

Franko runs many, "if not all," decisions "past [Amato] first" because Amato "has the final say." (Dkt. No. 174-12, at 177). Franko testified that at the time of his deposition, MCJ was feeding inmates the same amount of food and had no plans to change the amount of food. (Dkt. No. 174-12, at 187–88).

### H. Defendants' Experts

#### 1. Katherine Streeter

Defendants submitted expert reports by Katherine Streeter, a clinical dietician and assistant director of nutrition services in long-term, transitional, and adult day care facilities. (Dkt. No. 88-1, at 6, 9, 62,85, 87; Dkt. No. 174-35, at 2; Dkt. No. 174-46, at 2). In formulating her opinion, Streeter reviewed, among other things, discovery materials, the Complaint, "Jail Policy," MCJ meal records, recipes, and food production records, inmate grievance records, and deposition testimony. (Dkt. No. 88-1, at 23–24,75, 86, 92; Dkt. No. 174-35, at 8; Dkt. No. 174-46, at 7–8). In her most recent report, Streeter discussed her analysis of menus and recipes "for menu cycle days 1–14" for the 2011–2015 and 2016–2018 time periods. (Dkt. No. 174-46, at 3–4).[20] Streeter calculated the calories and macronutrients (carbohydrate, protein, and fat) and the

---

[20] Streeter noted that there "are two menus—one in effect from before 2011–2015, and a revision that took effect in 2016." (Dkt. No. 174-46, at 3).

nutritional value of the meals. (Dkt. No. 174-46, at 3). Streeter recognized that the "estimated calorie needs for a group of males ages 25–50 is 2900 calories per day and females in the same age group are estimated to need 2200 calories per day." (Dkt. No. 174-46, at 4). Streeter's analysis indicated that the menu for 2011–2015 provided, on average 2,851 calories per day, and that it provided carbohydrates, protein and fat within the recommended ranges. (Dkt. No. 174-46, at 6). Her analysis of the menu for 2016–2018 indicated that the menu provided, on average, 2822 calories per day and that it provided carbohydrates, protein and fat within the recommended ranges. (Dkt. No. 174-46, at 6). Streeter stated that, in her opinion, "[s]ubstitutions, when made, were typically nutritionally equivalent." (Dkt. No. 174-46, at 7). Streeter noted that there were "notations on many days indicating when a substitution for part of the house or for the whole house needed to be made." (Dkt. No. 88-1, at 13). In Streeter's opinion, "[t]ypically, nutritionally-equivalent substitutions were made during that time," including "oatmeal served instead of farina; rice served instead of potatoes, brownies instead of white cake." (Dkt. No. 88-1, at 13)

In a subsequent report, Streeter responded to the opinion of Plaintiffs' expert Heidi Jay Silver,[21] (Dkt. No. 180-1), that the substitutions were creating nutritional deficits as follows:

> Silver's calculations fail to account for instances when a substitution was made that provide *more* calories than the original item. During a brief look at menus from the time period she evaluated, I found at least a half-dozen such examples (below is not an exhaustive list, merely examples):
>
> o   1/2/13 lunch – mayo (118 kcal) instead of gravy (52 kcal)
> o   1/2/13 dinner – bologna (267 kcal) instead of turkey ham (142 kcal)

---

[21] Silver is a Research Associate Professor of Medicine in the Division of Gastroenterology, Hepatology, and Nutrition in the School of Medicine, Department of Medicine, at Vanderbilt University Medical Center, Nashville, Tennessee. (Dkt. No. 180-1). Silver opined that it was "apparent that there are frequent occasions when substitutions are being made for food items that provide fewer calories and other nutrients than what was planned in the written cycle menus." (Dkt. No. 180-1, at 5–6). As discussed *supra* Section III, the Court has disregarded Silver's report because it is unsworn.

- 1/4/13 dinner – cake (288 kcal) instead of sugar cookies (212 kcal)
- 1/22/13 lunch – mayo (118 kcal) instead of BBQ sauce (58 kcal)
- 1/23/13 dinner – 8oz chili with 4oz macaroni instead of 4 oz chili with 8oz macaroni (38 calories more, increased protein, decreased carbohydrate)
- 1/30/13 lunch – peas (90 kcal) instead of steamed cabbage (48 kcal)
- 2/11/13 dinner – rice (298 kcal) instead of sugar cookies (212 kcal)
- 2/28/13 lunch – coleslaw (199 kcal) instead of tossed salad with dressing (17+100 kcal)

(Dkt. No. 88-1, at 90 (internal citations omitted)).

Streeter stated that, in her experience, "[t]he elapsed period of fourteen hours between breakfast and dinner the previous day is typical in institutional settings (including group homes, hospitals, and nursing homes)." (Dkt. No. 88-1, at 12).

In her September 30, 2016 report, Streeter reviewed the "weight information" MCJ Nurse Gina Yesse provided to Franko in connection with a grievance investigation. (Dkt. No. 88-1, at 72). This information concerned five individuals and provided their weight on entry to MCJ and their present weight. (Dkt. No. 88-1, at 72). The length of time the individuals had been in MCJ, with one unknown, ranged from just over one month to nine months. (Dkt. No. 88-1, at 72). Each of the five individuals lost weight—1, 5, 8, 9, and 21 pounds—but in Streeter's opinion, "[n]one of the weight losses . . . meet the criteria for significant weight loss." (Dkt. No. 88-1, at 72).

## 2. William Graber, M.D.

Defendants also submitted an expert report by William Graber, M.D., who examined records concerning Hill and six other inmates. (Dkt. No. 88-1, at 79–81). Dr. Graber opined that

if these individuals "did have any weight loss [or malnourishment] it could be attributed to" a history of drug use or medical illness. (Dkt. No. 88-1, at 79–81).[22]

## III.    OBJECTIONS

Defendants object to several exhibits Plaintiffs submitted in opposition to the motion for summary judgment on the ground that they are inadmissible. (Dkt. No. 187, at 6–7). The exhibits include, as relevant here, inmate grievances, (Dkt. Nos. 180-25, 180-26, 180-27, 180-28, 180-29), a letter from "T. Hayes," (Dkt. No. 180-41), class member surveys, (Dkt. No. 180-24), a 2012 grievance response from the Commission of Corrections, (Dkt. No. 180-33), a photograph of class member Robert Reece, (Dkt. No. 180-37), and Plaintiff's expert report, (Dkt. No. 180-1). Defendants argue that they are inadmissible because "they are nothing more than unsworn statements" and have not been "attested to for the truthfulness of the assertions contained therein." (Dkt. No. 187, at 6).

As the Court finds the letter from "T. Hayes," (Dkt. No. 180-41), the class member surveys, (Dkt. No. 180-24), the 2012 grievance response from the Commission of Corrections, (Dkt. No. 180-33), and the photograph of class member Robert Reece, (Dkt. No. 180-37), are irrelevant to its analysis at this stage, Defendants' objection to those exhibits is denied as moot. Accordingly, the Court considers Defendants' objection to the inmate grievances and Plaintiffs' expert's report.

In general, even if evidence is not properly authenticated at the summary judgment stage, "so long as evidence 'will be presented in admissible form at trial,' it may be considered on

---

[22] Defendants also rely on a letter by Martin F. Horn, (Dkt. No. 88-1, at 77), which Defendants filed previously in this case and which is incorporated by reference in Mr. Horn's affidavit dated April 4, 2019. (Dkt. No. 174-43, at 2). He states he is "an expert in the area of Corrections." (Dkt. No. 174-43, at 2). In Horn's opinion, MCJ "has been diligent about providing adequate, nutritious and palatable food to the prisoners in its custody." (Dkt. No. 88-1, at 77).

summary judgment." *Harleysville Worcester Ins. Co. v. Wesco Ins. Co.*, 752 F. App'x 90, 93–94 (2d Cir. 2019) (Summary Order) (quoting *Santos v. Murdock*, 243 F.3d 681, 683 (2d Cir. 2001)); *see also Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998) ("On a summary judgment motion, the district court properly considers only evidence that would be admissible at trial.").

Here, the inmate grievances have not been presented in admissible form. That fault, however, may be cured easily upon proper authentication at trial. *See, e.g., Lawson v. Homernuk*, No. 15-cv-1510, 2018 WL 2081914, at *3, 2018 U.S. Dist. LEXIS 70820, at *9 (S.D.N.Y. Apr. 24, 2018) (noting that while the social worker's unsworn letter was hearsay, "the improper form would be cured if she testifies at trial."); *see also Rosensaft v. Ashton Tech. Grp., Inc.*, No. 97 Civ. 3138, 1997 WL 749384, at *3, 1997 U.S. Dist. LEXIS 19216, at *8 (S.D.N.Y. Dec. 4, 1997) (noting that evidence "in an inadmissible form" may be considered at the summary judgment stage where it "can easily be rendered admissible at the trial stage"). Additionally, to the extent Defendants challenge the grievances as hearsay, the Court has considered them not for the truth of the statements they contain, but as evidence that Amato and Franko had notice that there were complaints about the food at MCJ. *United States v. Dupree*, 706 F.3d 131, 137 (2d Cir. 2013) ("We have repeatedly held that a statement is not hearsay where, as here, it is offered, not for its truth, but to show that a listener was put on notice."). In any event, because Franko and Amato themselves testified that were aware of the grievances or inmates' complaints regarding food, (Dkt. No. 174-7, at 78; Dkt. No. 174-12, at 81), even if the Court were to disregard the grievances, the outcome at this stage would be the same. Thus, Defendants' objection to the inmate grievances are without merit.

Silver's expert report, however, must be disregarded. "Courts in this Circuit have uniformly held that unsworn expert reports do not satisfy the admissibility requirements of Fed. R. Civ. P. 56(e), and cannot be used [on] a motion for summary judgment without additional affidavit support." *Condoleo v. Guangzhou Jindo Container Co.*, No. 15-cv-4677, 2019 WL 2436214, at *5, 2019 U.S. Dist. LEXIS 69826, at *14–15 (E.D.N.Y. Apr. 23, 2019) (quoting *Glowczenski v. Taser Int'l, Inc.*, No. 04-cv-4052, 2010 WL 1957289, at *2, 2010 U.S. Dist. LEXIS 47269, at*6 (E.D.N.Y. May 13, 2010) (collecting cases)), *report and recommendation adopted*, 2019 WL 2574605, 2019 U.S. Dist. LEXIS 105190 (E.D.N.Y. June 21, 2019). The Court therefore has not considered Silver's report in determining whether Plaintiffs have raised a material issue of fact requiring trial.

## IV. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (summary judgment appropriate where

the nonmoving party fails to "'come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on' an essential element of a claim" (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010))).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986) (quoting *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

## V. DISCUSSION

### A. Conditions of Confinement Claim

Defendants seek summary judgment on the ground that the evidence fails to establish a "conditions of confinement violation." (Dkt. No. 174-1, at 7). Plaintiffs oppose Defendants' motion. (Dkt. No. 185, at 23).

A convicted prisoner's conditions of confinement claim is governed by the Cruel and Unusual Punishments Clause of the Eighth Amendment. *Walker v. Schult*, 717 F.3d 119, 125 (2d

Cir. 2013). The Due Process Clause of the Fourteenth Amendment governs a pretrial detainee's conditions of confinement claim. *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) ("A pretrial detainee's claims are evaluated under the Due Process Clause because '[p]retrial detainees have not been convicted of a crime and thus may not be punished in any matter—neither cruelly and unusually nor otherwise.'" (quoting *Iqbal v. Hasty*, 490 F.3d 143, 168 (2d Cir. 2007)).

To "establish a § 1983 claim for allegedly unconstitutional conditions of confinement" a plaintiff must show (1) that "objectively, the deprivation . . . suffered was 'sufficiently serious that he was denied the minimal civilized measure of life's necessities,'" *Walker*, 717 F.3d at 125 (quoting *Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001)); and (2) "that the officers acted with deliberate indifference to the challenged conditions." *Darnell*, 849 F.3d at 29. Although the first—objective—prong is the same under the Eighth and Fourteenth Amendments, the second, "subjective" or "mens rea prong," differs; it is defined subjectively under the Eighth Amendment, and objectively under the Fourteenth Amendment. *Id.* at 32, 35.

### 1. Objective Prong

"Under both the Eighth and Fourteenth Amendments, to establish an objective deprivation, 'the inmate must show that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health,' which includes the risk of serious damage to 'physical and mental soundness.'" *Darnell*, 849 F.3d at 30 (first quoting *Walker*, 717 F.3d at 125, second quoting *LaReau v. MacDougall*, 473 F.2d 974, 978 (2d Cir. 1972)). The Constitution "requires 'nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it.'" *Willey v. Kirkpatrick*, 801 F.3d 51, 69 (2d Cir. 2015) (quoting *Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir. 1983)). The Second Circuit has explained that "[t]here is no 'static test' to determine whether a deprivation is sufficiently serious; instead, 'the conditions themselves

must be evaluated in light of contemporary standards of decency.'" *Darnell*, 849 F.3d at 30

(quoting *Blissett v. Coughlin*, 66 F.3d 531, 537 (2d Cir. 1995)). These standards require that

prisoners "not be deprived of 'their basic human needs—e.g., food, clothing, shelter, medical

care, and reasonable safety'—and they may not be exposed 'to conditions that pose an

unreasonable risk of serious damage to [their] future health.'" *Jabbar v. Fischer*, 683 F.3d 54, 57

(2d Cir. 2012) (quoting *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002)).

The Second Circuit "has been reluctant to impose bright-line durational or severity limits

in conditions of confinement cases and has never imposed a requirement that [the plaintiffs]

show that they actually suffered from serious injuries." *Darnell*, 849 F.3d at 31 (citing *Walker*,

717 F.3d at 129); *see also Willey*, 801 F.3d at 68 ("Although the seriousness of the harms

suffered is relevant to calculating damages and may shed light on the severity of an exposure,

serious injury is unequivocally not a necessary element of an Eighth Amendment claim.").

"Bright-line limits are generally incompatible with [Eighth and] Fourteenth Amendment teaching

that there is no 'static' definition of a deprivation, and the Supreme Court's instruction that any

condition of confinement can mutually enforce another, so long as those conditions lead to the

same deprivation." *Darnell*, 849 F.3d at 31 (citing *Blissett*, 66 F.3d at 537). For example,

"[i]nadequate nutrition may be compounded by infestation" and an "overcrowded cell . . . may

exacerbate the effect of unsanitary conditions." *Id.* at 32. Consequently, "conditions of

confinement cases involve fact-intensive inquiries," *Id.* at 31, and "must be evaluated on a case-

by-case basis according to severity and duration." *Id.* at 37.

Here, Plaintiffs, all of whom were in MCJ for at least two weeks, have adduced evidence

that three to four times per week, portions were halved, (Dkt. No. 180-7, at 13, 16), two to three

times per week gravies and sauces were watered-down, (Dkt. No. 180-6, at 64–66), and that

some of the food served regularly, including chicken and other meats, for example, was of such

poor quality as to be inedible, that the vegetables lacked nutritional value, (Dkt. No. 180-6, at 20,

75), and that the kitchen at times failed to provide any substitution for planned menu items, (Dkt.

No. 180-34, at 2, 31, 84, 86). Viewed in the light most favorable to Plaintiffs, a reasonable

factfinder could further conclude that the hunger the inmates experienced as a result of the—

frequently daily—nutritionally and calorically inadequate meals was exacerbated by the 14-hour

time period between dinner and breakfast. (*See* Dkt. No. 180-10, at 25 (inmate testifying that

"your last meal" was at "four or five o'clock" and "they don't serve you enough" "[s]o . . . then

by six, seven, your stomach is touching your ribs" and by 11:00 p.m., when "[y]ou . . . go to

sleep," he "would be starving")). Indeed, there is evidence that the intensity of the hunger caused

inmates, who had no access to food other than the meals MCJ provided, to consume non-food

items, including cocoa butter and toothpaste, or large quantities of water to quiet their hunger.

(Dkt. No. 174-26, at 55; Dkt. No. 180-6, at 33). This evidence is sufficient to raise a material

issue of fact as to whether MCJ deprived the inmates at MCJ, including Hill and Rogers—the

named Plaintiffs,[23] of their basic human need for food. *See Jabbar*, 683 F.3d at 57; *see also*

*Willey*, 801 F.3d at 57, 69 (finding allegation that the plaintiff was served "nothing more than a

loaf of bread (usually stale) and dried-up cabbage" for one week was sufficient to raise an

inadequate-nutrition claim); *Robles*, 725 F.2d at 15 (explaining that "under certain circumstances

a substantial deprivation of food may well be recognized as being of constitutional dimension");

*Walker*, 717 F.3d at 125 ("[P]rison officials violate the Constitution when they deprive an inmate

---

[23] Both Hill and Rogers testified about the hunger they experienced at MCJ, the poor quality of the food, (Dkt. No. 174-26, at 39–40, 80, 82; Dkt. No. 174-27, at 44, 57), as well as the weight loss and other physical consequences, including hair loss, bleeding gums, dizziness, and nausea, they suffered at MCJ. (Dkt. No. 174-27, at 65; Dkt. No. 174-26, at 73, 56–59).

of his 'basic human needs' such as food, clothing, medical care, and safe and sanitary living conditions.").

Defendants argue that "Plaintiffs' entire theory of . . . deliberate indifference is based off the false premise that the inmates were receiving 1,700 calories per day," and that "inmates cannot claim that they are being withheld food when the records show that not to be the case." (Dkt. No. 174-1, at 7, 9). Defendants also argue that there is evidence that a number of inmates gained weight while at MCJ, and that certain inmates chose not to eat the food provided. (Dkt. No. 174-1, at 11, 13). These arguments, however, demonstrate the presence of factual issues as to the food provided at MCJ. Under such circumstances, summary judgment is inappropriate.

### 2. Subjective (Mens Rea) Prong

#### a. Eighth Amendment

To establish a violation of the Eighth Amendment, a plaintiff must show "the defendant official acted with 'a sufficiently culpable state of mind . . . such as deliberate indifference to inmate health or safety.'" *Walker*, 717 F.3d at 125 (quoting *Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001)). "To meet the subjective element, the plaintiff must show that the defendant acted with 'more than mere negligence.'" *Walker*, 717 F.3d at 125 (quoting *Farmer v. Brennan*, 511 U.S. 825, 835 (1994)). "To constitute deliberate indifference, '[t]he prison official must know of, and disregard, an excessive risk to inmate health or safety.'" *Id.* (quoting *Jabbar*, 683 F.3d at 57).

Plaintiffs have provided sufficient evidence to allow a reasonable factfinder to conclude that Amato, the Sheriff in charge of the jail, and Franko, who was jail administrator, were aware that the food provided to the inmates was inadequate, endangered their physical health, and deprived them of the basic human need for adequate sustenance. It is undisputed that both Amato and Franko knew, during the time periods Plaintiffs Hill (September 2013 to March 2014) and

Rogers (February 2013 to October 2013 and June 2014 to February 2015), were in MCJ, (Dkt. No. 75-6, at 16; Dkt. No. 174-27, 19–20, 35), that they were complaining that the food portions were inadequate, that they wanted more to eat, and that they were hungry. (Dkt. No. 180-27 (food grievances dated April 22, 2013 to October 27, 2013); Dkt. No. 174-7, at 10–11, 15; Dkt. No. 174-12, at 9, 13; Dkt. No. 180-35, at 3 (noting Sheriff had reviewed food grievance issues and investigation)). There is also evidence that when Franko had five of the inmates who had complained of weight loss weighed by the medical staff, he learned that they had all lost weight—between 1 and 21 pounds; he deemed the weight loss not "significant." (Dkt. No. 174-12, at 142). Despite this evidence and multiple grievances and complaints over a period of years, Plaintiffs have presented evidence, that, if credited, shows that Amato did little more than "double-check" with Franko to make sure "everything was done right"; he performed no investigations of his own. (Dkt. No. 174-7, at 24). Although Franko "investigated" the complaints, and contacted Trinity to make sure the menus were adequate, he determined there was "not a lot of substance to what the inmates were saying" about the lack of food and, other than emphasizing to the kitchen staff the importance of uniform portions, made no changes. (Dkt. No. 174-12, at 10, 142, 85; Dkt. No. 180-35, at 2). This evidence, combined with ongoing complaints and grievances by inmates that the portions were too small, that they were hungry, and that they were losing weight, would permit a reasonable factfinder to conclude that that Sheriff Amato and Jail Administrator Franko were aware of the harm the inmates faced as a result of the meals served at the MCJ but disregarded the risk to inmate health. *Walker*, 717 F.3d at 125 (explaining that "[e]vidence that a risk was 'obvious or otherwise must have been known to a defendant' may be sufficient for a fact finder to conclude that the defendant was actually aware of the risk." (quoting *Brock v. Wright*, 315 F.3d 158, 164 (2d Cir. 2003)).

### b. Mens Rea – Fourteenth Amendment

To establish the mens rea element of a conditions of confinement claim under the Fourteenth Amendment, "the pretrial detainee must prove that the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35. As the Second Circuit has explained, "the 'subjective prong' (or 'mens rea prong') of a deliberate indifference claim is defined objectively." *Id.* "A plaintiff must show 'something more than mere negligence' to establish deliberate indifference in the Fourteenth Amendment context." *Charles v. Orange Cty.*, 925 F.3d 73, 87 (2d Cir. 2019) (quoting *Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996)).

As discussed above, there is evidence that Sheriff Amato and Jail Administrator Franko *knew* as early as 2013 that the inmates of MCJ were complaining that the portions were too small, that they were hungry, that they were losing weight, that they wanted more food, and that these complaints continued and persisted even after this action was filed. Although there is also evidence that Sheriff Amato checked with jail staff to ensure that the food portions were correct and the inmates were receiving "what they are required in calories every day," (Dkt. No. 174-7, at 20, 24), and that Jail Administrator Franko contacted Trinity to make sure the menus were sufficient and reminded kitchen staff of the importance of uniform portions, (Dkt. No. 174-12, at 85), there is no evidence that the investigation went any further or that they made any changes. Indeed, Franko testified that he, together with Trinity, decided not to give the inmates "additional food." (Dkt. No. 174-12, at 85). There are, therefore, material issues of fact as to whether Defendants acted intentionally in failing to provide adequate nutrition and calories to MCJ inmates, or to mitigate the risks the deficient diet posed to the inmates, even though they knew

that inadequacies in the food provided posed "an excessive risk to the health or safety" of inmates who were completely dependent on the meals provided at MCJ for their nutritional sustenance.[24]

Thus, material issues of fact require trial with respect to the Eighth and Fourteenth Amendment conditions of confinement claims.

### B.    Defendants Amato and Frank

### 1.    Personal Involvement

Defendants move for summary judgment dismissing the claims against Amato and Frank on the basis that they were supervisory officials and lacked personal involvement in the alleged constitutional violations. (Dkt. No. 174-1, at 13–15). "A supervisor may not be held liable under section 1983 merely because his subordinate committed a constitutional tort." *Poe v. Leonard*, 282 F.3d 123, 140 (2d Cir. 2002). As the Second Circuit has explained, the personal involvement of supervisory personnel may be shown through evidence that they: (1) directly participated in the violation; (2) failed to remedy that violation after learning of it through a report or appeal; (3) created, or allowed to continue, a policy or custom under which the violation occurred; (4) had been grossly negligent in managing subordinates who caused the violation; or (5) exhibited deliberate indifference by failing to act on information indicating that an unconstitutional act was occurring. *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995). "In addition to satisfying one of these requirements, a plaintiff must also establish that the supervisor's actions were the proximate cause of the plaintiff's constitutional deprivation." *Raspardo v. Carlone*, 770 F.3d 97, 116 (2d Cir. 2014).

---

[24] Because the evidence reveals material issue of fact, which, if credited, would show that Amato and Franko failed to act, despite knowing that the conditions at MCJ posed an excessive risk to the inmates, the Court further concludes there are material issues of fact as to whether these Defendants "should have known that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35.

Plaintiffs have introduced evidence that both Amato and Franko were aware of inmates' complaints and grievances regarding the insufficient portions and hunger and that they failed to make any changes to the quantity or quality of the food provided at MCJ. Sheriff Amato was "in charge" of MCJ and present in the jail nearly every other day. Further, while Franko maintains that Amato had "the final say" on decisions concerning MCJ, there is evidence from which a factfinder could infer that he had supervisory authority over the kitchen staff and a direct line of communication with Trinity, which set the MCJ menu, and yet took no action to remedy the issue. This evidence raises a genuine issue of material fact as to whether, at a minimum, Amato and Franko "were 'informed of the violation through report or appeal' and 'failed to remedy the wrong.'" *Brandon v. Kinter*, 938 F.3d 21, 37 (2d Cir. 2019). The evidence is also sufficient to show that these individual defendants participated directly in the alleged constitutional violation. Crediting Plaintiffs' version of the facts, a reasonable factfinder could conclude that they knew of the complaints that the food was inadequate to sustain the inmates, and yet, they made a conscious decision to maintain the status quo after "double-checking" the menu and reminding the kitchen staff to serve uniform portions.

### 2. Qualified Immunity

Amato and Franko argue that even if Plaintiffs can establish personal involvement, they are entitled to qualified immunity. (Dkt. No. 174-1, at 17–26).

"Qualified immunity shields public officials from liability for civil damages if their actions were objectively reasonable, as evaluated in the context of legal rules that were 'clearly established' at the time." *Poe*, 282 F.3d at 132 (quoting *Vega v. Miller*, 273 F.3d 460, 466 (2d Cir. 2001)); *see Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam). To determine whether a defendant is entitled to qualified immunity, the Court must "assess whether 'under clearly established law, every reasonable officer would have concluded that [the defendant's]

actions violated [the plaintiff's constitutional rights] in the particular circumstances presented by the uncontested facts and the facts presumed in [the plaintiff's] favor.'" *Cugini v. City of New York*, 18-1378, 2019 WL 5473618, at *8, 2019 U.S. App. LEXIS 32021, at *22 (2d Cir. Oct. 25, 2019) (quoting *Brown v. City of New York*, 862 F.3d 182, 190 (2d Cir. 2017)). "Qualified immunity is an affirmative defense on which the defendant has the burden of proof." *Outlaw v. City of Hartford*, 884 F.3d 351, 367 (2d Cir. 2018). "While there does not have to be 'a case directly on point,' existing precedent must place the lawfulness of the particular arrest 'beyond debate.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011)). Here, Defendants argue that: (i) without bright line limits for inadequate nutrition claims it is not clearly established that a constitutional violation exists when "each inmate at the jail reacted differently," (Dkt. No. 174-1, at 20), (ii) the standard for deliberate indifference under the Fourteenth Amendment was not clearly established law in the Second Circuit until 2014, when *Darnell* was issued, (Dkt. No. 174-1, at 21), and (iii) because it is "an open issue in New York whether someone held at a jail for a parole violation qualifies as a pretrial detainee," the standard applicable "to each class member in this case is not clearly established." (Dkt. No. 174-1, at 24–25).

The right of prisoners and pretrial detainees to "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it" has been clearly established since at least 1983. *Willey*, 801 F.3d at 69 (quoting *Robles*, 725 F.2d at 15). In view of the material issues of fact regarding the meals provided at MCJ and whether they were nutritionally adequate, the Court concludes that questions concerning inmates' reaction to the diet go to the question of

damages—not liability—and therefore do not provide a basis for qualified immunity.[25] *See*

*Darnell*, 849 F.3d at 30 ("[T]he proper lens through which to analyze allegedly

unconstitutional . . . conditions of confinement is with reference to their severity and duration,

not the detainee's resulting injury."); *Willey*, 801 F.3d at 68 (explaining that "serious injury is

unequivocally not a necessary element of an Eighth Amendment claim" but "the seriousness of

the harms suffered is relevant to calculating damages." (citing *Hudson v. McMillian*, 503 U.S. 1,

4 (1992))).

Defendants argue that the standard for deliberate indifference under the Fourteenth

Amendment was not clearly established law in the Second Circuit until 2014, when *Darnell* was

decided, (Dkt. No. 174-1, at 21), and that they are therefore entitled to qualified immunity with

respect to the Fourteenth Amendment claim. Plaintiffs acknowledge "for purposes of qualified

immunity, that the conduct of Amato and Frank must be considered under the 'old' Eighth

Amendment standard." (Dkt. No. 185, at 35). The Court agrees. Prior to *Darnell*, to satisfy the

subjective prong of the deliberate indifference inquiry, a plaintiff was required to show "that the

government-employed defendants disregarded a risk of harm to the plaintiff *of which the

defendant was aware*"—the standard applicable to Eighth Amendment deliberate indifference

claims. *Caiozzo v. Koreman*, 581 F.3d 63, 71 (2d Cir. 2009) (emphasis added), *overruled by

Darnell*, 849 F.3d 17. In *Darnell*, the Second Circuit held that a plaintiff can meet the subjective

prong by showing "that the defendant-official acted intentionally to impose the alleged

condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition

---

[25] Defendants cite no legal authority for the proposition that qualified immunity applies in the absence of a bright line rule. The Second Circuit has cautioned against the use of bright-line rules in the context of the Fourteenth Amendment. *See*, *e.g.*, *Darnell*, 849 F.3d 17, 31 ("Bright-line limits are generally incompatible with Fourteenth Amendment teaching that there is no 'static' definition of a deprivation."). In any event, on this record, construing the facts in the light most favorable to the Plaintiffs, qualified immunity is not warranted.

posed to the pretrial detainee even though the defendant-official knew, *or should have known*, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35 (emphasis added). As the Second Circuit has noted, "*Darnell* was decided in 2017 and thus could not have clearly established that reckless[ness] . . . amounts to deliberate indifference" under the Fourteenth Amendment, prior to 2017. *Monaco v. Sullivan*, 737 F. App'x 6, 15 (2d Cir. 2018) (Summary Order).

Here, however, viewed in the light most favorable to Plaintiffs, there is evidence that Defendants *knew* that the food being provided at MCJ was nutritionally and calorically inadequate and that the inmates were hungry and disregarded the risk that posed to Plaintiffs' health and safety. As such evidence would be sufficient to show an Eighth Amendment violation, *see supra* Section V.A.2., and it has long been clearly established that "pretrial detainees, who have not been convicted of any crimes, retain at least those constitutional rights that . . . are enjoyed by convicted prisoners," *Bell v. Wolfish*, 441 U.S. 520, 545 (1979), Defendants' argument is unavailing.[26] For the same reasons, unresolved issues regarding a class member's status as a pretrial detainee or convicted prisoner does not warrant the application of qualified immunity. It was clearly established in 2013 that the Constitution "does require that prisoners be served 'nutritionally adequate food that is prepared and served under conditions which do not

---

[26] In *Monaco*, the plaintiff, who was a pretrial detainee during the relevant time period, alleged that the defendant psychiatrist was deliberately indifferent in violation of the Fourteenth Amendment by failing to prescribe Lithium. 737 F. App'x at 14. The district court, applying the Eighth Amendment standard then-applicable to Fourteenth Amendment deliberate indifference claims, concluded that the plaintiff failed to meet the subjective prong because there was "no evidence suggesting that [the defendant] knew that his failure to prescribe Lithium posed a threat to" the plaintiff. *Id.* at 15. On appeal, the plaintiff argued for reversal asserting that under *Darnell* "a jury could reasonably conclude that [the defendant] acted recklessly." *Id.* The Second Circuit disagreed and explained that "[a]ssuming *arguendo* that [the plaintiff] is correct that [the defendant's] failure to prescribe Lithium was reckless, [the defendant] would still be entitled to qualified immunity" because "*Darnell* was decided in 2017 and thus could not have clearly established that reckless medical treatment amounts to deliberate indifference at the time [the defendant] treated" the plaintiff. *Id.* Here—unlike *Monaco* where there was no evidence that the defendant was aware of the risk he posed to the plaintiff—there are material issues of fact regarding whether Amato and Franko knew of and disregarded a risk of harm to Plaintiffs.

present an immediate danger to the health and well being of the inmates who consume it.'" *Robles*, 725 F.2d at 15 (quoting *Ramos v. Lamm*, 639 F.2d 559, 571 (10th Cir. 1980)). Viewed in the light most favorable to Plaintiffs, the evidence indicates that Amato and Franko were aware of and disregarded the risk the diet at MCJ posed to inmates. Such conduct would violate both the Eighth, and consequently, the Fourteenth Amendment. *See Darnell*, 849 F.3d at 29 ("A detainee's rights are 'at least as great as the Eighth Amendment protections available to a convicted prisoner.'" (quoting *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983))); *see also Tolan v. Cotton*, 572 U.S. 650, 656 (2014) ("'[T]he salient question . . . is whether the state of the law' at the time of an incident provided 'fair warning' to the defendants 'that their alleged [conduct] was unconstitutional.'" (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002))). Thus, an inmate's status is irrelevant for purposes of qualified immunity at this stage of the litigation. Accordingly, Defendants' motion for summary judgment on qualified immunity grounds is denied.

### C.   Municipal Liability

Plaintiffs allege that Defendant Montgomery County is liable under 42 U.S.C. § 1983 for the allegedly unconstitutional conditions in MCJ. Defendants seek summary judgment dismissing the municipal liability claim, arguing that there is no evidence of a "formal policy at the jail or a specific action or decision by an official responsible for establishing final policy to not feed the inmates." (Dkt. No. 174-1, at 15–17). Plaintiffs oppose summary judgment. (Dkt. No. 185, at 25–26).

"For the purpose of Section 1983, a municipality is not vicariously liable for the acts of its employees," *Green v. City of New York*, 465 F.3d 65, 80 (2d Cir. 2006) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)), but a municipality is liable when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts

may fairly be said to represent official policy, inflicts the injury," *Monell*, 436 U.S. at 694. "To hold a municipality liable in such an action, 'a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right.'" *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995) (quoting *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983)).

A municipal policy or custom may be established where the facts show: (1) a formal policy, officially promulgated by the municipality, *Monell*, 436 U.S. at 690; (2) action taken by the official responsible for establishing policy with respect to a particular issue, *Pembaur v. Cincinnati*, 475 U.S. 469, 483–84 (1986); (3) unlawful practices by subordinate officials so permanent and widespread as to practically have the force of law, *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127–30 (1988); or (4) a failure to train or supervise that amounts to "deliberate indifference" to the rights of those with whom the municipality's employees interact, *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). "[A] municipal policy may be inferred from the informal acts or omissions of supervisory municipal officials." *Zahra*, 48 F.3d at 685. Further, "municipal inaction such as the persistent failure to discipline subordinates who violate civil rights could give rise to an inference of an unlawful municipal policy of ratification of unconstitutional conduct." *Batista*, 702 F.2d at 397; *see also Turpin v. Mailet*, 619 F.2d 196, 200 (2d Cir. 1980) (holding that "where senior personnel have knowledge of a pattern of constitutionally offensive acts by their subordinates but fail to take remedial steps, the municipality may be held liable for a subsequent violation if the superior's inaction amounts to deliberate indifference or to tacit authorization of the offensive acts").

Plaintiffs assert that "Montgomery County is liable both because its employees implemented the unconstitutional practice of denying detainees adequate nutrition, and because of the actions and inactions of [Amato and Franko,] its Chief Policy makers, who directed this misconduct." (Dkt. No. 185, at 25–26). "[W]hen a subordinate municipal official is alleged to have committed the constitutional violation, municipal liability turns on the plaintiffs' ability to attribute the subordinates' conduct to the actions or omissions of higher ranking officials with policymaking authority." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 126 (2d Cir. 2004) (Sotomayor, J.). As the Second Circuit has explained, "[one means of doing so . . . is to establish that a policymaker ordered or ratified the subordinates' actions." *Id.* "Thus, where a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a 'deliberate choice,' that acquiescence may 'be properly thought of as a city 'policy or custom' that is actionable under § 1983.'" *Id.* (quoting *City of Canton*, 489 U.S. at 388).

Plaintiffs' assert that Amato, as Sheriff, is the final policy maker for MCJ. Under New York law, "the sheriff of each county shall have custody of the county jail of such county." N. Y. Corr. Law § 500-c(1). Further, there is evidence showing that Amato had the authority to make policy concerning all matters related to foodservice at the jail. *See Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000) ("Where the contention is not that the actions complained of were taken pursuant to a local policy that was formally adopted or ratified but rather that they were taken or caused by an official whose actions represent official policy, the court must determine whether that official had final policymaking authority in the particular area involved."). Amato testified that: (i) he was in charge of the jail, (ii) that he had "decided not to" allow the food commissary to remain in the jail because it "was a problem," and (iii) he investigated the inmates' complaints

regarding inadequate food by ensuring the food portions were correct. (*See* Dkt. No. 180-2, at 111, 39, 20, 24). There is also evidence that Amato had issued directives indicating that "meals are of great importance." (Dkt. No. 180-35, at 2).

There is also evidence, which, if credited, would establish that Amato, in his "failure to act . . . "exhibit[ed] deliberate indifference to constitutional deprivations caused by subordinates.'" *Outlaw*, 884 F.3d at 372 (quoting *Cash v. County of Erie*, 654 F.3d 324, 334 (2d Cir. 2011)). "[A] plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with deliberate indifference as to its known or obvious consequences." *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 407 (1997).

Viewed in the light most favorable to Plaintiffs, there is evidence that Amato was aware that the inmates at MCJ had complained, over a period of years, that they were hungry, that they wanted more food, and that the portions were too small, (Dkt. No. 174-7, at 10–11, 15, 78), and that he conducted a superficial investigation into the continuous complaints by talking to his staff, and checking with Franko, the jail administrator, "to make sure everything was done right." (Dkt. No. 174-7, at 24, 53). There was also evidence that Amato was aware that at least five inmates had lost weight. (Dkt. No. 174-7, at 76). Thus, Plaintiffs have raised a material issue of fact as to whether Amato's failure to act in response to the repeated complaints regarding inadequate portions and that the inmates in the jail were hungry, was done with deliberate indifference as to the known or obvious consequences chronic underfeeding would pose to the inmates at MCJ. *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995) ("Deliberate indifference to claims of such civil rights violations—tantamount to a custom or policy sufficient to support municipal liability under § 1983—may be inferred from a municipality's lack of

appropriate response to repeated complaints of such violations."); *see also Ricciuti v. New York City Transit Authority*, 941 F.2d 119, 123 (2d Cir. 1991) ("The inference that a [municipal] policy existed may . . . be drawn from circumstantial proof, such as . . . evidence that the municipality had notice of but repeatedly failed to make any meaningful investigation into charges that police officers had used excessive force in violation of the complainants' civil rights."); *Fiacco v. City of Rensselaer*, 783 F.2d 319, 327 (2d Cir. 1986) (explaining that a municipality "should not take a laissez-faire attitude toward the violation by its peace officers of the very rights they are supposed to prevent others from violating"). Accordingly, Defendants' motion for summary judgment dismissing the municipal liability claim against Montgomery County is denied.

## VI.    INJUNCTIVE AND DECLARATORY RELIEF CLAIMS

Defendants note that the Court previously dismissed Plaintiffs' claims for injunctive and declaratory relief (Second Cause of Action), (Dkt. No. 174-1, at 25; Dkt. No. 128), but that they are present in the Amended Complaint, which Plaintiffs filed after the Court's dismissal. (Dkt. No. 136, at 14). Accordingly, Plaintiffs' claims for injunctive and declaratory relief (Second Cause of Action) are stricken from the Amended Complaint.

## VII.   CONCLUSION

For these reasons, it is

**ORDERED** that Defendants' objections are **GRANTED in part** and **DENIED in part**; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 174) is **DENIED**; and it is further

**ORDERED** that the Second Cause of Action is stricken from the Amended Complaint.

**IT IS SO ORDERED.**

Date: November 7, 2019
Syracuse, New York

Brenda K. Sannes
U.S. District Judge